**\*\*\*CAPITAL CASE\*\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

No. 4:18-CV-1559-AGF

VINCENT McFADDEN,                                                         Petitioner

v.

ANN PRECYTHE, Director,
     Missouri Department of Correction                                  Respondent

---

## PETITION FOR A WRIT OF HABEAS CORPUS

---

LAURENCE E. KOMP, MO Bar 40446
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-471-8282
laurence_komp@fd.org

SCOTT W. BRADEN, AR Bar 2007123
JOHN C. WILLIAMS, AR Bar 2013233
Assistant Federal Public Defenders
Federal Public Defender's Office
Eastern District of Arkansas
1401 West Capitol, Suite 490
Little Rock, AR 72201
501-324-6114
scott_braden@fd.org
john_c_williams@fd.org

*Counsel for Vincent McFadden*

## TABLE OF CONTENTS

**Procedural History** ..................................................................................................1

**Jurisdiction** ..................................................................................................... 10

**Statement on Defenses**.................................................................................. 11

**Claims for Relief**............................................................................................ 12

**Claim 1 Counsel was ineffective at sentencing**.................................................. 12

**Issue 1-1 Counsel was ineffective for failing to investigate and present Vincent's life history**.......................................................................................... 13

**Issue 1-2 Counsel was ineffective for failing to refer the case to different attorneys who could have performed a competent defense**..............................23

**Issue 1-3 Counsel was ineffective for failing to present evidence of Vincent's poor neuropsychological functioning**...................................................28

**Issue 1-4 Counsel was ineffective for failing to discover evidence of McFadden's language and verbal impairments, and to present expert testimony in support of the same**........................................................................ 31

**Issue 1-5 Counsel was ineffective for failing to perform and present the results of a PET scan** ...................................................................................35

**Issue 1-6 Counsel was ineffective for failing to order a thorough MRI analysis**.................................................................................................38

**Issue 1-7 Counsel was ineffective for failing to present a child-development expert to explain the importance of Vincent's childhood** .................................................................................... 39

**Issue 1-8 Counsel was ineffective for failing to prepare expert testimony** ........44

**Issue 1-9 Counsel was ineffective for failing to use Norman White or a similar expert to testify about the effects of being raised in Pine Lawn**..................................................................................................... 46

i

**Issue 1-10 Counsel was ineffective for failing to present lay witnesses to discuss McFadden's experience growing up in Pine Lawn** .......... 50

**Issue 1-11 Counsel was ineffective for failing to request that the jury view the crime scene** ....................................................................................... 54

**Issue 1-12 Counsel was ineffective for not presenting a trauma expert** ............. 55

**Issue 1-13 Counsel was ineffective for failing to present evidence that Vincent didn't assault or seriously injure Daryl Bryant and Jermaine Burns** ........................................................................................... 59

**Issue 1-14 Counsel was ineffective for failing to object to unredacted copies of Vincent's prior offenses** ..................................................... 61

**Issue 1-15 Counsel was ineffective or failing to object to the prosecutor's improper arguments** ................................................................ 63

**Claim 2 Counsel was ineffective at the guilt phase** ............................................. 65

**Issue 2-1 Counsel was ineffective for failing to investigate and present evidence about Eva Addison's inability to see the murder** ................... 65

**Issue 2-2 Counsel was ineffective for failing to impeach the single eyewitness to the crime** ....................................................................... 67

**Issue 2-3 Counsel was ineffective for failing to object to improper closing argument** ................................................................................. 69

**Issue 2-4 Counsel was ineffective for failing to raise mental-health issues in the guilt phase** ......................................................................... 71

**Claim 3 Counsel was ineffective at voir dire** ....................................................... 72

**Issue 3-1 Counsel should have investigated and moved to exclude Juror Williams** ................................................................................................ 72

**Issue 3-2 Counsel was ineffective for failing to rehabilitate witnesses who expressed qualms about the death penalty** .............................. 74

Issue 3-3 Counsel was ineffective for failing to pursue a
fair-cross-section claim .................................................................... 77

Claim 4 Counsel should have moved to suppress evidence that
Vincent was found with drugs at his arrest ........................................ 79

Claim 5 The seating of Juror Williams denied McFadden an
impartial jury and due process, in violation of the Sixth and
Fourteenth Amendments .................................................................... 80

Claim 6  The exclusion of jurors Brunetti, Behrens, and Stevens
violated the Sixth Amendment............................................................ 82

Claim 7  The trial court violated Vincent's Sixth Amendment rights
by finding that his prior convictions were "serious assaultive"
instead of submitting this factual issue to the jury ............................. 84

Claim 8 The trial court's penalty-phase instructions violated the
right to jury sentencing under the Sixth Amendment and the right
to a reliable capital sentencing under the Eighth Amendment......................... 86

Claim 9 Prosecutorial misconduct during trial violated due process ................ 89

Claim 10 Evidence and argument about the motive for the prior
murder violated the Double Jeopardy Clause....................................... 98

Claim 11 Presentation of excessive evidence about the prior murder
violated due process  ....................................................................... 100

Claim 12 The death sentence violates the Eighth Amendment because
thirty-seven percent of the jury pool was excluded for inability to
vote for death .................................................................................. 103

Claim 13 McFadden wasn't tried by a fair cross-section of the
community, in violation of the Sixth Amendment ............................... 104

Claim 14 The prosecutor's bolstering of Eva Addison violated due process .. 105

Claim 15 The prosecutor's leading of Eva Addison violated due process....... 107

**Claim 16 Denial of access to the sole eyewitness's school and medical records violated McFadden's right to present a complete defense and the Confrontation Clause**................................................................ 109

**Claim 17 The prosecutor withheld evidence in violation of** *Brady v. Maryland* ........................................................................... 111

**Claim 18 Striking of jurors for their religious beliefs violated equal protection**.................................................................................113

**Prayer for Relief**.................................................................................115

**Certificate of Service**.........................................................................116

## PETITION FOR A WRIT OF HABEAS CORPUS

Vincent McFadden petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. He asks the Court to vacate the judgment of the St. Louis County Circuit Court, under which he was (1) convicted of first-degree murder, armed criminal action, and threatening a witness; and (2) sentenced to death.

This petition is filed within the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Additional claims and additional facts in support of the claims stated herein may emerge as investigation of this case continues. If necessary, McFadden will move to amend this petition.

## PROCEDURAL HISTORY

This case arises from the shooting of Leslie Addison on May 15, 2003. McFadden was arrested for the offense two days later on the strength of an eyewitness account by Eva Addison, Leslie's sister and McFadden's girlfriend. The State charged McFadden with additional crimes as well: the April 2002 assault of Daryl Bryant and Jermaine Burns, and the July 2002 killing of Todd Franklin. McFadden was convicted of both these additional offenses and twice sentenced to death for the Franklin murder, first at a March 2005 trial and again at a July 2007 retrial occasioned by the State's *Batson* violations. This petition concerns only the conviction and sentence arising from the Addison murder. As of this filing the Franklin case remains pending in state post-conviction.

1

In the Addison case, the State charged McFadden with first-degree murder, armed criminal action, and tampering with a witness. It sought the death penalty for first-degree murder. McFadden pleaded not guilty. Trial counsel were Karen Kraft and Sharon Turlington, who also represented McFadden in the Franklin matter. Trial was held on March 15–23, 2006, under case number 03CR-2642. McFadden did not testify. The jury found McFadden guilty on all counts and imposed the death penalty. Judgment was entered on May 24, 2006. The Missouri Supreme Court vacated the judgment on direct appeal because the prosecutor committed *Batson* violations and because the Court had previously vacated McFadden's conviction for the Franklin murder, which served as an aggravator in the Addison case. *McFadden v. State*, 216 S.W.3d 673 (Mo. 2007) (*McFadden I*).

Retrial in the Addison case was held under case number 03-CR-2642-02 on March 31–April 10, 2008, about nine months after the State obtained a second conviction and death sentence for the Franklin murder. Kraft and Turlington again served as trial counsel. McFadden again did not testify. The State lodged the same three charges as before and again sought the death penalty. In support of that sentence, the State alleged six statutory aggravating circumstances: six separate prior offenses arising from the Franklin killing and the Bryant/Burns assault. The jury found all six aggravating circumstances and recommended a death sentence, which the trial court duly imposed in a judgment entered on June 12, 2008.

McFadden appealed his conviction and sentence to the Missouri Supreme Court under case number SC89429. He raised the following fifteen points in the appeal (paraphrased here):

I.     The seating of juror Jimmy Williams denied McFadden an impartial jury, due process, a fair trial, and freedom from cruel and unusual punishment because Williams failed to disclose that he was a veniremember at the Bryant/Burns trial, which provided the basis for four statutory aggravators.

II.    Submission of the prior-offense aggravators in six separately numbered paragraphs denied McFadden due process, a properly instructed jury, and freedom from cruel and unusual punishment.

III.   The trial court violated McFadden's right to due process, an impartial jury, and freedom from cruel and unusual punishment by granting the State's for-cause strikes of three veniremembers who were able to impose a death verdict.

IV.    The trial court's failure to instruct the jury to make a factual determination that McFadden's prior convictions were "serious assaultive" violated his rights to due process, a properly instructed jury, jury sentencing, and freedom from cruel and unusual punishment.

V.     The trial court's jury instructions and admission of non-statutory aggravation violated McFadden's right to due process, a properly instructed

jury, appellate review, reliable sentencing, and freedom from cruel and unusual punishment.

VI.   The prosecutor committed prosecutorial misconduct in his arguments at voir dire, guilt-phase closing, and sentencing-phase closing.

VII.   Double Jeopardy barred admission of evidence that McFadden killed Todd Franklin for testifying against his friends because the Franklin jury rejected that motive as an aggravating circumstance.

VIII.   Admission of evidence about the Franklin homicide encouraged a death verdict based on emotion and violated McFadden's rights to due process, a fair trial, reliable sentencing, and freedom from cruel and unusual punishment.

IX.   McFadden's death sentence is disproportionate and violates his rights to due process, a fair trial before a properly selected jury, reliable sentencing, and freedom from cruel and unusual punishment because (1) thirty-seven percent of the venire was struck for inability to impose death; (2) African Americans were underrepresented in the venire; and (3) the prosecutor committed misconduct.

X.   The prosecutor's bolstering of Eva Addison's credibility denied McFadden's rights to due process, a fair trial, confrontation, and freedom from cruel and unusual punishment.

XI.   Admission of evidence about other crimes violated McFadden's rights to due process, a fair trial, and freedom from cruel and unusual punishment.

XII.   The prosecutor's leading questions of Eva Addison violated McFadden's rights to due process, confrontation, a fair trial, reliable sentencing, and freedom from cruel and unusual punishment.

XIII.   The trial court violated McFadden's rights to due process, confrontation, cross-examination, a fair trial, reliable sentencing, and freedom from cruel and unusual punishment by (1) permitting Stacy Stevenson's testimony about what he heard an unidentified man say; (2) denying McFadden access to Eva Addison's school and medical records; (3) allowing the prosecutor to testify that Eva's eyesight was excellent; and (4) allowing the prosecutor to bootstrap an identification of McFadden through Eva's testimony.

XIV.   The trial court violated McFadden's rights to due process, confrontation, a fair and reliable sentencing trial, and freedom from cross-examination by admitting the tape recording of Eva Addison and "Slim" when the tape lacked a proper foundation and contained hearsay.

XV.   The trial court struck twenty jurors on the basis of religious belief, in violation of McFadden's rights to a jury chosen without regard to religious belief, equal protection, due process, a fair trial, and freedom from cruel and unusual punishment.

5

On January 29, 2013, the Missouri Supreme Court affirmed the convictions and sentence. *State v. McFadden*, 391 S.W.3d 408 (Mo. 2013) (*McFadden II*). On April 19, 2013, McFadden filed a petition for writ of certiorari in the United States Supreme Court. The Supreme Court denied the petition on October 7, 2013.

On June 14, 2013, McFadden filed a *pro se* motion for state post-conviction relief (Rule 29.15) in St. Louis County Circuit Court under case number 13SL-CC02170. The Office of the State Public Defender, Appellate/PCR Division, was appointed and filed an amended Rule 29.15 motion on September 18, 2013. Valerie Leftwich, Jeannie Willibey, and Robert Lundt represented McFadden in these proceedings. The petition presented thirteen grounds for relief (paraphrased here):

1.  The seating of juror Jimmy Williams and the motion court's limitation on investigation into this issue violated McFadden's rights to due process, a fair trial, an impartial jury, and freedom from cruel and unusual punishment.

2.  Counsel was ineffective at voir dire for failing to investigate whether juror Jimmy Williams had been a veniremember at the Bryant/Burns trial.

3.  Counsel was ineffective at the guilt phase for failing to investigate and present witnesses to impeach Eva Addison (namely, Brandon Travis, Arnell "Smoke" Jackson, Maggie Jones, Theresa Jones, and Margaret Walsh).

4.  Counsel was ineffective at the guilt phase for failing to investigate and challenge the State's evidence regarding the lighting and distance at the crime scene.

6

5. Counsel was ineffective at the guilt phase for failing to raise the following objections:

   a. The prosecutor improperly vouched for Eva Addison's eyesight after she failed to correctly read the time on a clock during direct examination.

   b. The prosecutor improperly argued in closing that the worst place you can shoot a woman is in the face.

   c. The prosecutor improperly argued in closing that he would speak for Leslie Addison.

   d. The prosecutor misled the jurors by telling them to come back with first-degree murder or to not come back at all.

   Alternatively, appellate counsel was ineffective for not arguing these points on appeal.

6. Counsel was ineffective at sentencing for failing to call Dr. Norman White or a similarly qualified expert who could present a social profile of McFadden and his upbringing.

7. Counsel was ineffective for failing to bring mitigation witnesses about McFadden's upbringing, to wit: Labaron Bass, Willibea Blackburn, Vicki Blackburn, Audrey Brown, James Clark, Kelly Crowder, Willie Crowder Janetta Hubbard, Shonta Hubbard, Lisa Hubbard, Tiffany (Hood) Huglie, Arnell Jackson, Brandon Johnson, Victor Johnson, Tanisha Kirkman, Johnny Kirkman, Terrence Lee, Sean Nichols, Thurman Shelton, Glenn Sykes, Lisa

7

Thomas, Kenneth Watkins, Elwyn Wells, George Wells, Clara Wings, Andrian Wright, and Janet Wright.

8. Counsel was ineffective at sentencing for failing to call Dr. Wanda Draper or a similarly qualified child-development expert.

9. Counsel was ineffective at sentencing for failing to call Dr. Michael Gelbort or a similarly qualified neuropsychologist.

10. Counsel was ineffective for failing to obtain a PET brain scan.

11. Counsel was ineffective for failing to investigate and rebut the statutory aggravators of prior serious assaultive convictions for first-degree assault and armed criminal action against Daryl Bryant and Jermaine Burns.

12. Counsel was ineffective for failing to object to admission at the penalty phase of records concerning two of McFadden's prior convictions.

13. Counsel was ineffective for failing to adequately object to the prosecutor's improper closing argument at the penalty phase.

The motion court denied relief in an order dated March 17, 2017.

McFadden appealed denial of the Rule 29.15 motion under Missouri Supreme Court case number SC96453. The brief stated the following points on appeal (paraphrased here):

I.    The motion court erred by limiting questioning about Jimmy Williams to two jurors.

II.    The motion court should have permitted additional questioning of the jurors after the original judge recused on the basis of *ex parte* contacts with the prosecutor about McFadden's case.

III.   Counsel was ineffective for failing to question Jimmy Williams about his knowledge of McFadden from serving as a venireman at a previous trial in which McFadden was the defendant.

IV.    Counsel was ineffective for failing to call Dr. Norman White to present a social profile of McFadden and his upbringing.

V.     Counsel was ineffective for failing to call witnesses Lisa Thomas, Tanesia Kirkman-Clark, Elwynn Walls, Sean Nichols, and Willabea Blackburn to testify about McFadden's upbringing.

VI.    Counsel was ineffective for failing to object to admission at the penalty phase of records concerning two of McFadden's prior convictions.

VII.   Counsel was ineffective for failing to call Dr. Wanda Draper or a similarly qualified expert to testify about McFadden's upbringing.

VIII.  Counsel was ineffective for failing to call Dr. Michael Gelbort or a similarly qualified expert to testify about McFadden's brain limitations.

IX.    Counsel was ineffective for failing to object to the prosecutor's argument in closing at sentencing that (1) McFadden believes in the death penalty and (2) the jury should hold, hug, and love Leslie Addison and Todd Franklin so as not to let them down.

9

X.      Counsel was ineffective for failing to present a PET brain scan.

XI.     Counsel was ineffective for failing to call Maggie Jones, Margaret Walsh, and Arnell Jackson to discredit Eva Addison's account of Leslie Addison's death.

XII.    Counsel was ineffective for failing to present evidence to rebut the prior assaults on Daryl Bryant and Jermaine Burns.

XIII.   Counsel was ineffective for failing to present photos depicting the crime-scene lighting and measurements concerning the distance between Eva Addison and Leslie Addison when Leslie was killed.

On July 17, 2018, the Missouri Supreme Court affirmed denial of the Rule 29.15 motion. *McFadden v. State*, 553 S.W.3d 289 (Mo. 2018) (*McFadden III*). The mandate issued on August 21, 2018.

The United States District Court for the Eastern District of Missouri appointed the Federal Public Defender's Office for the Western District of Missouri to represent McFadden as federal habeas-corpus counsel on September 21, 2018. ECF No. 5. The same court appointed the Federal Public Defender's Office for the Eastern District of Arkansas as additional habeas-corpus counsel on January 2, 2019. ECF No. 9.

## JURISDICTION

Under 28 U.S.C. § 2254, a district court has jurisdiction to entertain an application for a writ of habeas corpus on behalf of a person in custody under the judgment of a state court. McFadden petitions for a writ of habeas corpus to vacate his convictions

10

and sentences because they were obtained in violation of the United States Constitution. The Court thus has subject-matter jurisdiction under § 2254.

The proper respondent to a habeas-corpus petition is a person who has custody of the petitioner. *See* 28 U.S.C. § 2243; Section 2254 R. 2(a). Anne Precythe, Director of the Missouri Department of Corrections, has custody of McFadden and is the proper respondent in this case.[1]

Under 28 U.S.C. § 2241(d), a state prisoner in custody under the judgment of a state court may bring a habeas-corpus petition in "the district court for the district within which the State court was held which convicted and sentenced him." Because McFadden was convicted and sentenced within the Eastern District of Missouri, venue is proper.

## STATEMENT ON DEFENSES

In its scheduling order (ECF No. 12) the Court directed McFadden to addresses the following: (a) the federal constitutional provision(s) under which the claim arises; (b) whether the claim is exhausted, with specific citation to the state-court record; (c) whether the claim is procedurally defaulted; (d) whether McFadden seeks an evidentiary hearing and, if so, whether 28 U.S.C. § 2252(e)(2) permits a hearing; (e) whether 28 U.S.C. § 2254(d) governs the claim; (f) whether *Teague v. Lane*, 489 U.S. 288 (1989), bars the claim; and (g) the claim's merits.

---

[1] The position of warden at the Potosi Correctional Center, where McFadden is housed, is currently vacant.

11

McFadden addresses (a), (d), and (g) in each individual claim below. For the remaining issues McFadden states as follows:

- **Exhaustion.** Each claim in the petition is exhausted, whether because McFadden fairly presented the claim in state-court proceedings or because there is no longer an available avenue in state court for reviewing the claim. Record citations are provided below for those claims that McFadden fairly presented to the state courts.

- **Procedural default**. Unless otherwise noted below, McFadden asserts that his claims are not procedurally defaulted.

- **AEDPA review**. The standard of review stated at 28 U.S.C. § 2254(d) governs claims that were "adjudicated on the merits in State court proceedings." For claims that were fairly presented to the state courts, McFadden states his position on applicability of this standard of review below. Otherwise the claim was not adjudicated on the merits in state court proceedings and AEDPA review doesn't apply.

- **Retroactivity.** None of the claims in this petition is *Teague*-barred.

### CLAIMS FOR RELIEF

For the following reasons, the Court should grant the petition for a writ of habeas corpus and vacate McFadden's convictions and/or death sentence.

**Claim 1:     Counsel was ineffective at sentencing.**

For the reasons stated in following sub-claims, McFadden's counsel performed deficiently at his sentencing trial and in a manner that prejudiced him, thus depriving him of the right to counsel guaranteed by the Sixth Amendment.

**Issue 1-1:      Counsel was ineffective for failing to investigate and present Vincent's life history.**

Counsel in a capital case have a duty to conduct a thorough investigation of their client's background and to present that evidence at sentencing. Without a thorough life history, counsel cannot humanize their client or explain his circumstances to the jury. And without humanizing the client, counsel cannot hope to obtain a life sentence. Here, counsel failed to adequately investigate and present evidence about McFadden's background. Had they done so, the jury would have heard the following:

Vincent McFadden was born on March 25, 1980, to Theresa Brown at St. Louis County Hospital. Theresa was twenty years old. The birth certificate contained a question mark where the father's name would usually go. Vincent[2] was undersized as an infant, weighing five pounds, seven ounces. To his paternal cousin, Yolanda Johnson, he "looked like a rat" and "didn't look like he was real." He compared negatively to another baby born into the family just three weeks earlier, Cortez McFadden. The family notices a striking difference between Cortez and Vincent in

---

[2] In this claim, "Vincent" refers to Petitioner Vincent McFadden. "Vince" refers to Vincent McFadden, Sr.

their developments. Family members recognized that at some point Vincent stopped growing physically, emotionally, and mentally.

For the first six months of Vincent's life, Vincent and Theresa lived with Theresa's parents, David Lee Brown and Glenda Brown. Vincent's father, Vincent McFadden, Sr. ("Vince"), came into the picture when Vincent was six months old. Unfortunately for Vincent, as a family member describes: "their dad was no good and their mom was not better."

Vince met Theresa in high school. Vince, the son of Arkansas sharecroppers who moved to Missouri when their children were young, joined the military in 1977. While in the military, he participated in a remedial reading course, was disqualified for an assignment for a nuclear-duty position, and faced warnings from his supervisor for failing to regularly attend medical appointments. He was stationed in Germany when his son was born and didn't return home until Vincent was six months old. Upon Vince's return he was unprepared to be a father. Rather than living with Theresa and his newborn son, Vince lived with his mother. Though Vince was an alcoholic and would develop a raging drug addiction, Theresa left him to care for Vincent by himself for prolonged periods. A family member explains that while "some men are proud to have sons, not Vince."

Theresa was no more equipped to care for Vincent than Vince was. She lacked a nurturing nature and didn't so much as hug her children (who also included Vincent's

14

younger sisters, Shawn'ta McFadden and Rochelle Brown). A young mother, Theresa had been the victim of abuse in her childhood at the hands of her father.

Theresa worked long hours and often wasn't home to take care of her children. Glenda and David were perhaps his most consistent caretakers, but that was hardly a stable situation, particularly when David was in charge. On one occasion Glenda came home to find that her husband had kicked Vincent out of the house. It was cold out. Vincent was on the porch, huddled in a blanket, waiting for his grandmother to return and let him in. Family members report that David did not like his male grand-children—he felt they would grow up to be bad. The Brown home dynamic was fraught. Glenda fought depression over David's treatment of her. David serially cheated on her and has several other children outside their marriage.

Theresa constantly moved her small children between family members, to the point that Vincent couldn't recognize who he belonged to. Often she didn't even bother to drop them off with other family members, instead leaving them at home to fend for themselves. On one occasion a neighbor called Glenda to report that Theresa had abandoned her children at the house. Family reports that Theresa consistently abandoned and neglected all of her children. One family remember says, "I never saw much of Theresa; whenever the kids were around, she wasn't."

Yolanda recalls that when Vincent was eight Theresa got mad at him and kicked him out of the beauty shop where she was working. Yolanda found him walking down the highway by himself. She frequently witnessed the poor conditions in which

15

Theresa raised her children and offered to take in Vincent. Theresa responded that he'd "be dead or in jail before I give him to you." Nor was this the only time Theresa rejected help from family members in raising Vincent. While she was happy to leave him at a family member's house temporarily, she was never to accept help in nurturing him though she was unable to perform that duty herself.

Theresa and Vince got back together for a period of a few years when Vincent was a toddler and in elementary school. Theresa was hard on her children during this time and gave what Vince characterizes as "whoopins." Multiple family members report that all the children were beaten with extension cords. Vincent would receive the beating on his genitals. Vince confronted Theresa about these punishments because they were so aggressive.

His complaints about Theresa's treatment of his son aside, Vince also beat Vincent. As Vince admitted at trial, he and his son lived together for a time when Vincent was older but it didn't work out. What counsel neglected to elicit was that Vince beat Vincent. Counsel could have called Karen Holmes, his step mother, who heard Vince beating his son in the bathroom on at least one occasion.

Vince eventually left for good. Vince sat Vincent down and told him that he was the man of the family now and needed to look after his sisters. Even with Theresa in the home, albeit sporadically, family members described Vincent as the leader of the house.

16

Though Vince wouldn't remain totally absent from his son's life, he wasn't a functional father. Vince simply was not around Vincent much. Alcoholism afflicted multiple generations of the McFadden family; Vince did not escape the disease and was frequently drunk. Vince also became entrapped by a crack addiction. Once Vincent saw his father using crack in the street. This stripped the elder McFadden of any moral authority over his son when it came to lessons about drug use.

Once his father left, nine-year-old Vincent now had new responsibilities, particularly given his mother's frequent absences. He would get up early to make breakfast for his siblings. He had to find money for lunches and would come home with bags of clothes for his sisters to wear. But when Theresa was around she beat Vincent even harder than before. According to Vincent's cousin Yolanda, Theresa hated Vincent because she reminded her of Vince; when she would beat Vincent, she repeated the mantra, "You're just like your father."

In truth, Vince had been little more of a parent than Theresa. His alcohol problems and crack addiction continued. Vincent's cousin Lisa Thomas recalls thinking that Vince always smelled like fish—her childhood perception of the smell of alcohol. Vince simply wasn't there for his son. Glenda and others remember that Vincent would wait futilely for his father to come over and do things with him. He cried in Glenda's lap when his father failed to show.

On those occasions that Vince did interact with Vincent, he showed Vincent no encouragement. One family member, Darlene Loftus, reports that Vince would do

17

anything for his girls but would not respond to Vincent. Vince marginalized his own, thus carrying on family tradition of choosing favorites. Growing up, Vince's twin brother, Spence—who received his father's name despite being second-born—was their mother's favorite. Vincent's sister Shawn'ta remembers how this dynamic worked in her household. Vince thought his son was a failure at a young age. Shawn'ta recalls an incident in which Vince bought her and Rochelle a backpack with school supplies but didn't buy one for Vincent. The message was clear: Vincent wasn't going to be successful in school so why bother?

In fact, Vincent was not successful in school, but that was due in large part to lack of support at home and constant movement between schools and family members. His cousin Yolanda recalls that, as a kindergartener, Vincent thought his birth name was "J.R."—a sobriquet given to indicate that he was a junior—and didn't even realize that his real name was Vincent. To Yolanda that was the first sign that his parents were teaching him nothing. Unlike his sisters, Vincent never got a chance to go to magnet schools, where he was more likely to be successful. Before he turned fifteen he attended Pine Lawn Elementary, Clark Elementary, Langston Middle School (twice), Pruitt Middle School, King Middle School, Stevenson Middle School, and Tri A Academy.

At Pine Lawn, the principal, Mr. Zikes, was well known for paddling the students. Vincent's Aunt Denise pulled his cousin David out of the school after one such beating. At Clark Elementary, the danger came from the students rather than the

18

administrators. According to Shawn'ta, the children bullied each other; the bullying would begin as verbal but would progress into "assault." Children would have their shoes and coats stolen. Clark Elementary essentially served as an introduction into gang life—Shawn'ta recalls that children would be attacked if they wore the wrong colors.

Vincent was frequently bullied as a child. Glenda recalls that he had particular problems with a boy named Mane Bolden, who would intrude on the porch and "just smack Vincent." He presented an easy target because he was so small. That remained true even as he got older. Glenda recalls that as a teen he was jumped by three older boys who hit him with a bat and caused his eye to become swollen shut.

Vincent's exposure to gangs and his frequent need to fight to survive led him to legal trouble. In 1995, he received probation for unlawful use of a weapon. At this time he was living with his grandparents, the Browns, and had minimal supervision. His probation officer, Richard Nelson, recognized his need for structure and recommended that be sent to Tarkio Academy, a boys' boarding school in Tarkio, Missouri. He attended the school from 1995 to 1996. His performance there illustrated his promise if he had only been given an adequate opportunity in a stable, non-violent environment. In May 1995, soon after his arrival, he was given a Woodcock-McGrew-Werdner Mini-Battery of Achievement, a standardized test of skills in reading, writing, and math. He scored in the fourth percentile; the examiner noted that his performance as a fifteen-year-old was comparable to that of a third-

19

grader. Seven and a half months later he took a similar test and achieved a score in the twenty-first percentile. By May 1996, when he was tested a third time, he was able to score in the eighty-eighth percentile. He made the honor roll in September 1995 and was otherwise recognized for his achievements. Vincent's parents were wrong—he wasn't a hopeless case. He'd just never before been placed in an environment where he was given a chance to succeed.

Unfortunately, Vincent had only a yearlong stay at Tarkio and was discharged in May 1996. Leaving Tarkio meant an end to the services and supervision that allowed him to excel. He returned to Pine Lawn—as a family member puts it, "not a place you wanted to be. You'd lock your cars when you'd drive though there." He attended Normandy High School, which returned him to the war zone he was living in before. Normandy drew its students from different municipalities within St. Louis County— each of which had multiple gangs. Fighting among the various gangs was incessant at the school and there was no safe and secure environment in which to learn.

Vincent enrolled in Normandy by listing his maternal grandparents' Pine Lawn address. But at this time he was staying more with his mother in St. Louis City than in Pine Lawn. His grandfather David took exception and reported Vincent to the school board. Vincent was then kicked out of Normandy for attending school in the wrong district. From that point on he no longer attended school.

Vincent's post-Tarkio problems ranged beyond school and into his home life. During his teen years his mother took up with several different boyfriends with whom

20

Vincent constantly battled and who abused the children. When Vincent returned from Tarkio, Theresa was living with Robert Reid, Robert's sisters, and their children. These adults slept in the children's beds and made the children sleep on the floor. The family's time with Reid was short but brutal. Robert beat the children with an extension cord. Shawn'ta remembers that Reid would tie her to a chair. Just for a laugh, Reid lied to Theresa about Vincent's bad behavior and provoked his mother into whipping him.

Theresa next went to live for a brief time with Darrell Jackson, who cared nothing about the children and routinely beat them. He especially disliked Vincent. Jackson kicked Vincent out of the house because, according to Jackson's recollection, Jackson "didn't want to have to shoot him." Vincent went back to staying with his grandparents. Not long thereafter Jackson lost patience with the younger children's messes and evicted the rest of the family as well.

Out of school, with no real home to speak of, and no positive role model to rely on, Vincent found himself alone on the streets. The traumatic violence he witnessed and experienced was constant and unrelenting. Vincent's friends were killed on a routine basis. To name just a few:

- Mikey Lock, one of Vincent's best friends, died on February 3, 1997, at the age of twenty-one. Vincent was sixteen at the time. Cause of death was gunshot wounds to the head and chest. The death gave Vincent nightmares and he routinely woke up screaming Mikey's name.

21

- Another friend, Casey Cuffie, died a few weeks later, on February 28, 1997, at the age of twenty-two. Cuffie's death certificate lists cause of death as "assault by firearms."

- A week later, on March 5, 1997, Vincent's friend Lenney Robinson died, also the result of "assault by firearms." He was only fifteen at his death.

- On July 20, 2002, when Vincent was twenty-two, his friend Ollie Bellamy died of a "gunshot wound to the head and a gunshot wound to the right thigh." Bellamy was twenty-four.

- On March 2, 2003, Charles Hudson died at age twenty-eight of a "gunshot wound of thorax."

Constantly besieged by violence, Vincent was pulled deeper and deeper into a life that threatened him physically and offered no way out. On August 24, 2001, when he was twenty-one years old, Vincent was shot in the leg. Though no one was ever prosecuted for the crime, the shooter was Daryl Bryant—the person who Vincent was convicted for targeting in the assault that would provide an aggravating factor in this case. After Bryant shot him, Vincent became increasingly paranoid because so many of his friends had been killed.

The jury heard essentially none of this evidence about abuse, violence, and neglect in Vincent's upbringing. Instead counsel provided only sketchy details about Vincent's upbringing through five family members and a friend. Counsel never investigated

22

outside of St. Louis. They failed to interview numerous family members in Arkansas and California. They never interviewed anyone with any connection to Tarkio. They failed to request all available records, some of which now have been destroyed due to the passage of time. Had counsel performed a thorough investigation into McFadden's upbringing and presented their findings to the jury, it's reasonably likely that he would have received a life sentence.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Issue 1-2:** **Counsel was ineffective for failing to refer the case to different attorneys who could have performed a competent defense.**

Attorneys in capital cases must seek to advance the client's best defense—and best case for life—in a reasonably competent manner. Before the 2008 Addison retrial, trial counsel Karen Kraft and Sharon Turlington had exhausted their ability to represent McFadden competently. Their failure to cede the representation to attorneys who could perform a competent defense amounts to ineffective assistance of counsel.

23

The 2008 retrial was McFadden's fourth capital-sentencing hearing in a four-year span. McFadden was tried and convicted in 2005 for the Franklin murder and in 2006 for the Addison murder. The Missouri Supreme Court reversed those convictions because of state misconduct—the exclusion of racial minorities from jury service. McFadden was then retried (and again sentenced to death) for the Franklin murder in 2007.

Kraft and Turlington represented McFadden at each of these proceedings. By 2008, they were unmotivated and at an impasse. Kraft admits that the trials "beat them down." By Turlington's admission, the attorneys were "out of ideas." Indeed, Turlington believed that different attorneys should have handled the retrial. Instead, as Turlington characterizes it, she and Kraft went into the Addison retrial stuck in a "rut."

The attorneys' fatigue showed in the preparation for and conduct of the Addison retrial. In each sentencing hearing, they presented less and less mitigation, to the point that they offered only six friend-and-family witnesses at the Addison resentencing. They performed no investigation before the 2008 retrial. They rested on what had failed before and did nothing original. But criminal defense attorneys have a duty to investigate carefully all reasonably available mitigation, and failure to obtain a life sentence at a previous trial does not absolve counsel of that responsibility. In a capital case, less is not more. Counsel's failure to secure a life sentence in the earlier trials suggested that more needed to be done, not less.

24

Kraft and Turlington also omitted important mitigation that they'd pursued before. Trial counsel testified in post-conviction that they didn't have a problem with the substance of any expert's testimony—they just didn't like the way the expert delivered the message. Yet, in spite of the extra time allotted to them by virtue of the retrial, they never obtained a substitute expert to present testimony consistent with their stated mitigation theory. Their negligence caused them to completely abandon mitigation based on McFadden's problematic childhood and his brain dysfunction. *See* Issues 1-3, 1-7. An attorney looking at the case afresh would not have given up on these theories of mitigation—indeed, she would have developed them further and would have come up with other mitigation besides.

Not only were the attorneys fatigued, but they were also at odds with their client. In a pre-trial motion filed on February 20, 2008, McFadden flagged a conflict he was having with his attorneys. McFadden complained that Kraft and Turlington had refused to investigate the lighting at the scene of the crime, had refused to investigate the State's witnesses for impeachment purposes, and had refused to take steps necessary to obtain documents that might impeach Eva Addison, the sole eyewitness to the crime. This motion was a continuation of McFadden's long dissatisfaction with his attorneys' performance in the Addison matter. Before the first trial, he'd complained to the court that "trial counsel's overall demeanor towards defendant's case is that he is guilty and should plead guilty which is against defendant's interest and right to have a fair trial and competent attorneys represent defendant."

25

Trial counsel should have brought the inherent hardships in this fourth case to the attention of the trial court long before the scheduled trial date. Counsel was so ineffective as to deprive McFadden of even an opportunity to present a mitigation defense, a central right in our criminal-justice system. This resignation that they could not win—and should do less than before—ignored their duties as McFadden's advocates. Trial counsel should have known that their continued representation would result in the incompetent representation. As McFadden's trial counsel, Kraft and Turlington were responsible to investigate and present mitigation. Because the succession of defeats had caused them to despair of any positive outcome, they should have filed a motion to withdraw from representing McFadden. Their inaction directly caused an abbreviated mitigation presentation that simply regurgitated lay testimony previously rejected by a jury. By remaining on the case, their performance fell below an objective standard of reasonableness.

No reasonable defense attorney would have declined to investigate the information simply due to ennui. McFadden's trial lawyers were required to vindicate his cause by putting on a real mitigation presentation. A lawyer must act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. *See* Missouri Rule of Professional Conduct 4-1.7, cmt. ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities

26

or interests."). Kraft and Turlington failed in this responsibility. They should have known that they could no longer represent McFadden effectively.

Had counsel acted reasonably by allowing new, motivated counsel to represent McFadden, there's a reasonable likelihood that the outcome of sentencing would be different. In particular, new attorneys would have performed the sort of thorough investigation required in a capital case and would have presented mitigation evidence that went well beyond the brief testimony of the six witnesses Kraft and Turlington presented. In particular, new counsel would have presented the following:

- Evidence that McFadden has an impaired brain. *See* Issues 1-3, 1-5, & 1-6.

- Evidence that McFadden has significant language and verbal impairments. *See* Issue 1-4.

- Evidence that McFadden had a childhood characterized by abuse and neglect. *See* Issues 1-1 & 1-7.

- Evidence that McFadden grew up in a violent community, Pine Lawn, which provided no safety and no hope. *See* Issues 1-9, 1-10, & 1-11.

- Evidence that McFadden experienced multiple traumas on a daily basis living in the community of Pine Lawn. *See* Issue 1-12.

Had counsel received the full mitigation presentation that new counsel could have given him—and not just the nub of a defense his flummoxed attorneys actually provided—it's likely that the jury would have found a life sentence more appropriate

27

for McFadden than a death sentence. As a result, the Court should order a new sentencing trial.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Issue 1-3:     Counsel was ineffective for failing to present evidence of Vincent's poor neuropsychological functioning.**

Before the 2008 retrial, counsel had developed evidence that McFadden suffers from significant neuropsychological dysfunction, including dysfunction in areas of the brain that control impulsivity and judgment. Indeed, Dr. Michael Gelbort testified about these problems during the first Addison trial as well as during McFadden's first trial for the murder of Todd Franklin. Yet rather than presenting the jury with this important evidence, counsel called only five of McFadden's family members and one friend. This decision was unreasonable and constitutes deficient performance. Had the jury learned of McFadden's brain damage, it's reasonably likely that it would not have sentence McFadden to death.

Dr. Gelbort, a neuropsychologist, evaluated McFadden in 2004 with a battery of neuropsychological instruments. As he explained in his testimonies, McFadden's 85 IQ places him in the low-average range of intelligence. Testing showed significant limitations in academic abilities: reading at a fourth-grade level, spelling at a fifth-grade level, and math at a sixth-grade level. He scored within the first percentile in his ability to form visual memories. And testing of the frontal lobe and executive functioning showed a pattern of left-frontal deficits. As Dr. Gelbort explained, while McFadden's brain functioning would allow him to do repetitive acts well, he would perform poorly in situations in which he had to problem-solve, think on his feet, or process information at a normal rate of speed or faster. McFadden's poor brain functioning would also cause him to be excessively impulsive.

While Dr. Gelbort did not definitively identify a source for McFadden's brain dysfunction, he noted two possible head injuries that McFadden suffered in childhood, one when he fell down the stairs and another when he fell off playground equipment. McFadden's school records were fine when he was young but got worse as he grew older, a pattern consistent with an impaired child's inability to handle the increasing complexity of middle- and high-school curricula. Dr. Gelbort also noted that McFadden lacked the sort of stable home life that would help him manage his cognitive defects.

It was objectively unreasonable for counsel to omit presentation of this information at the Addison retrial. At the Rule 29.15 hearing, Addison's trial attorneys

29

testified that they chose not to use Dr. Gelbort again because they felt he had performed poorly at the first trial. Yet the attorneys also acknowledged that there was nothing unreliable or flawed about Dr. Gelbort's data—McFadden most definitely does suffer from the sort of brain damage Dr. Gelbort found. Even if the attorneys had good reason not to present this evidence through Dr. Gelbort, that does not mean they had good reason *to omit it altogether*. There are many neuropsychologists in this country besides Dr. Gelbort who would have been available to evaluate McFadden and to testify to the brain damage he suffers. By allowing their distaste for their original neuropsychologist to cloud their judgment, the attorneys deprived their client of significant mitigating evidence that the jury should have heard.

Had the jury indeed heard this evidence, it's reasonably likely that they would have sentenced McFadden to life in prison rather than death. Not only would the evidence have given the jury a complete picture of McFadden's functioning—it would have offered some explanation for the Addison and Franklin murders, which both exhibited disinhibition and lack of control. Counsel's failure to link these impulsive acts to obvious evidence of brain damage renders the sentencing outcome unreliable and requires a new sentencing trial.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 113–26; Rule 29.15 Appeal Brief at 115–21. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the

30

Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 312–13. That merits determination is contrary to and/or an unreasonable application of the law. The prejudice element is reviewed *de novo. See Rompilla v. Beard*, 545 U.S. 374, 390 (2005). McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 1-4:     Counsel was ineffective for failing to discover evidence of McFadden's language and verbal impairments, and to present expert testimony in support of the same.**

Trial counsel possessed numerous red flags that pointed to a language impairment or disorder based on McFadden's then-current verbal functioning, as well as his history. Dr. Gelbort's neuropsychological testing documented a significant disparity between McFadden's performance and verbal functioning. The minimal school records counsel collected documented academic difficulties and additional shortcomings of McFadden's verbal functioning. McFadden consistently scored below his age level in language and language function. Trial counsel were also aware, albeit in a minimalistic manner, of the poverty, neglect, failure to attach with a parental figure, and chaotic upbringing that McFadden experienced from his birth and into his adulthood. It was well known at the time that verbal abilities were particularly vulnerable to environmental deprivations.

31

Trial counsel were aware of McFadden's lack of maturity from their interactions with him. At minimum, McFadden's filing of *pro se* motions demonstrates a communication or comprehension problem between McFadden and his attorneys.

In addition to the red flags of which they were aware, reasonably competent counsel would have discovered a multigenerational component. Both sides of McFadden's family contained members described as slow or developmentally impaired, including Gwendolyn McFadden, the primary mother figure in McFadden's life.

Defense counsel deficiently failed to engage and present expert testimony to explain to the jury how McFadden's circumstances lead to a substantial verbal and language deficit in all categories. Defense counsel failed to investigate and explain to the jury that a language impairment impeded McFadden's development of a critical tool that drastically impacted his ability to communicate and, in turn, behave. McFadden's impairments negatively impacted his ability to understand and express language. As a result, this deficit affects McFadden's ability to comprehend meaning and to recall and relate information.

Available expert testimony could have explained how McFadden's language impairments, in an invasive and insidious manner, disrupted his ability to personally develop, to learn, to control and adapt his behavior, to engage in adequate decision-making, to understand cause and effect or consequences, and to meaningfully

32

communicate with others. In short, McFadden's impairment rendered him unable to interpret and respond to what was going on around him, or to cognitively process.

Language impairments impact the ability to regulate negative emotions—to self-regulate—and to problem solve. High stress and complicated situations serve only to exacerbate the impairment. An expert could have explained that without those skills McFadden would act impulsively and at times aggressively due to his inability to access alternatives. McFadden could not begin to process or comprehend the complexity of events occurring around him. Trial counsel could have presented how the language disorder radically affected multiple aspects of McFadden's life. Further, reasonable counsel armed with knowledge of this deficit could have explained to a jury how this could have been addressed throughout his life and in prison as well. Given the obvious red flags, reasonable trial counsel would have engaged the appropriate expert.

The experts trial counsel did engage were not properly consulted with to discuss McFadden's language disorder. Had trial counsel adequately explored the facts of McFadden's language barriers and framed the question to these experts in a timely manner, they would have evaluated the effects of McFadden's language disability, accurately diagnosed him, and testified at trial. This would have opened the door to further neurocognitive deficits.

Trial counsel's shortcomings prejudiced McFadden. The jury that sentenced McFadden to death was deprived of expert testimony that would have humanized

McFadden and explained how this language impairment reverberated throughout his life on a daily basis. The language disability impacted McFadden's decision-making ability his entire life, including at the time of this offense and at trial. The jury's failure to learn of this information undermines confidence in the death sentence.

Not only is it a source of affirmative mitigation, trial counsel could have utilized this unique trait of McFadden to address and minimize the effect of the State's non-statutory aggravation. The State implored the jury to impose death on the mistaken view that McFadden's obstinacy was the reason he had not taken advantage of opportunities afforded him. Trial counsel could have explained how language deficiencies impaired McFadden's ability to understand and comply with the terms of his probation and to complete programs successfully. Rather than being recalcitrant or defiant, McFadden actually had an insurmountable language impairment that prevented his comprehension. Given these shortcomings, McFadden could not succeed. The jury's failure to learn of this information undermines confidence in the death sentence.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing.

34

*See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

> **Issue 1-5:**     **Counsel was ineffective for failing to perform and present the results of a PET scan.**

Trial counsel unreasonably failed to follow their own expert's advice to perform a PET scan on McFadden. In 2004, McFadden submitted to an MRI at St. Louis University and counsel sent the imaging to Dr. David Preston for interpretation. Dr. Preston concluded that the MRI was "normal." However, based on McFadden's reported history of head trauma and drug abuse, he recommended a PET scan, explaining that it is "not uncommon" for people fitting McFadden's profile to have a normal MRI but an abnormal PET scan. Dr. Preston said he knew of two specific places in St. Louis that could do a PET scan—St. Louis University and Mallinckrodt Institute of Radiology—and that there are "undoubtedly others." Outside of St. Louis he recommended Boone Hospital in Columbia, MO. (Rule 29.15 Ex. 33). Despite these recommendations, trial counsel ordered no PET scan.

Rejection of their own expert's advice amounted to an unreasonable failure to investigate. That is particularly so given the other information they had about their client and his background. For example, counsel knew that McFadden's maternal aunt, Lisa Northern, and other members of his family had a genetic condition that causes brain abnormalities. They knew that his maternal grandmother, Glenda Brown, had a brain tumor removed. They knew that McFadden complained to them of

35

frequent headaches. And, in addition to the head trauma Dr. Gelbort identified, they knew that a group of boys had attacked McFadden with a bat to the face when he was fifteen years old. Each of these facts provided additional red flags, in addition to Dr. Preston's direct advice, that a PET scan was warranted.

Counsel's primary reason for omitting this testing, as stated at the Rule 29.15 hearing, was that it might undercut Dr. Gelbort's testimony. Even if that was a professionally responsible reason for omitting the PET scan before the first trial, at which Dr. Gelbort testified, it had no bearing on the second trial, at which counsel had decided Dr. Gelbort should not testify. Counsel had a duty to continue investigating McFadden's brain functioning, particularly where they knew he had brain problems and a family history of mental issues but had no evidence to present to the jury on these issues.

When Rule 29.15 counsel ordered the PET scan, it showed major deficits in McFadden's brain function. Dr. Gur, who conducted the PET scan analysis, found abnormalities in the functioning of the frontal lobes, the hippocampus, and the amygdala. Additionally, McFadden's superior parietal and angular gyrus are abnormal by four to five standard deviations. McFadden's PET scan profile fits the profile for Kluver-Bucy syndrome, a rare condition in which damage to the amygdala and frontal lobe combine to create emotionlessness followed by "sham rage" or extreme aggressiveness. Dr. Gur found McFadden's mental problems consistent with the sort of head trauma he is known to have suffered.

It's reasonably likely the jury would have voted for a life sentence had it learned the results of the PET scan. Those results would have gone directly to McFadden's moral culpability and informed the jury that, even though he could comprehend the difference between right and wrong, he had significant limitations that implicated his ability to control his conduct. Moreover, had counsel performed the PET scan, it would have added additional weight to Dr. Gelbort's testing and would have caused counsel to reconsider their omission of Dr. Gelbort's findings (if not Dr. Gelbort himself) at the second sentencing trial. In combination with the evidence Dr. Gelbort found, the PET scan would have offered the jury an especially powerful reason to impose a life sentence.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 126–30; Rule 29.15 Appeal Brief at 126–33. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 313–15. That merits determination is contrary to and/or an unreasonable application of the law. The prejudice element is reviewed *de novo*. *See Rompilla*, 545 U.S. at 390. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

37

**Issue 1-6:**   **Counsel was ineffective for failing to order a thorough MRI analysis.**

As noted in the previous claim, trial counsel obtained an MRI for McFadden before trial; Dr. Preston informed trial counsel that it showed a "normal brain." But counsel should have known that the MRI wasn't necessarily thorough. On September 15, 2004, several weeks before McFadden went for the MRI, McFadden's aunt, Lisa Northern, told his mitigation specialist, Lisa McCulloch, about her experience with an MRI. Her MRI also showed nothing wrong, but in fact she had a brain tumor that later caused an aneurysm. Northern told McCulloch that based on her experience "an MRI may not be thorough." Given what they knew it was unreasonable for counsel to accept the label of "normal brain" at face value.

PCR counsel recognized this possibility after consulting with Dr. Gur. He informed them that the 2004 MRI analysis and report did not examine all the areas of the brain closely. Medical doctors may look at an MRI only to determine acute abnormalities and may overlook more subtle deficits. Dr. Gur found the 2004 MRI imaging too low-resolution for him to conduct an analysis. But. PCR counsel failed to follow up by obtaining better images.

Had trial counsel performed reasonably in the circumstances, they would have obtained the more detailed imaging and analysis necessary to locate brain damage. Lisa Northern's experience should have tipped them off to this need. Moreover, had counsel consulted with a PET-scan expert such as Dr. Gur, as the previous claim

alleges they should have, the expert would have informed them of the need for thorough MRI analysis. In discovery, McFadden will seek a fresh MRI and a complete analysis of the MRI to prove prejudice arising from counsel's deficient performance.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

> **Issue 1-7:** **Counsel was ineffective for failing to present a child-development expert to explain the importance of Vincent's childhood.**

At trial, counsel put on an exceedingly paltry and brief penalty-phase presentation concerning McFadden's upbringing that was limited to five family members and a friend. The jury heard the following:

- **Lynette Elaine Hood**, an older friend, testified that, before she left Pine Lawn in 2001, McFadden would babysit for her. McFadden got shot in the leg once. She moved from Pine Lawn because of the many shootings there.

- **Gwendolyn McFadden**, McFadden's paternal aunt, explained who McFadden's parents and sisters are. McFadden's father was in the Army and

stationed in Germany when McFadden was born. He never stayed

continuously in the home. McFadden's mother, Theresa Brown, would

leave McFadden home alone when she went to work. McFadden would call

his grandparents and they would watch him for days at a time. McFadden

was picked on as a child. McFadden's father, Vincent McFadden, Sr., was a

drunk until about four years before the trial. She denied that McFadden's

father abused him.

- **Minnie McFadden**, McFadden's paternal grandmother, said that

  McFadden was small for his age as a child and would get jumped. He would

  stay at her house for months at a time. He got his GED.

- **Lisa Northern**, McFadden's maternal aunt, testified that McFadden asked

  to come live with her when he was 13 or 14 but his mother wouldn't allow

  it. Instead he was sent to a school in Tarkio, MO. She and her husband,

  Donald Northern, would take McFadden places as a child.

- Counsel presented the prior testimony of **Donald Northern**, McFadden's

  uncle. According to Northern, McFadden was picked on and the neighbor

  sicced his dog on him. Northern helped McFadden get a job after Tarkio.

- **Vincent McFadden, Sr.,** professed that he wasn't a good father. He,

  Theresa Brown, and Vincent lived together as a family until Vincent was

  about five. The elder McFadden sometimes had to go feed his son when

40

Theresa left him alone. He and Vincent tried living together when Vincent was a teen but it didn't work out.

In short, the sentencing phase consisted of scattered testimony that gave the jury little to grasp onto. The jury received hints of McFadden's past but little that was concrete or coherent.

Reasonably competent counsel would have hired a child-development expert to compile information about Vincent's past into a coherent narrative, to present that information to the jury, and to explain how Vincent's past affected him as a person. Counsel in fact hired such an expert—Dr. Wanda Draper—to examine Vincent's upbringing and to explain it to the jury at the two Franklin trials and the first Addison trial. It was unreasonable for counsel to omit a child-development expert from the fourth Addison trial. Reasonable counsel would have presented a narrative of McFadden's upbringing and an explanation of its effect on him, not just scattered remarks from a few family members. Counsel could have presented this evidence through Dr. Draper or through another expert. Either approach would have adequately informed the jury of McFadden's upbringing. Instead counsel left the jury with little mitigation to work with (a point the prosecutor hammered on in his sentencing-phase closing argument).

Had counsel presented an expert of this nature the jury would have gotten much more detail about issues the lay witnesses only hinted at. The picture of Vincent's chaotic childhood would have become much more robust. Vincent had no devoted

41

caregiver from the time he was a newborn. He was shuffled among his mother, father, maternal grandmother, paternal grandmother, and Aunt Gwendolyn from the time his was born. This situation lasted into his adolescence. Vincent never knew who he actually belonged to or who was supposed to be taking care of him. Vincent often cried as he waited in vain for his father to come get him. Once, when he was staying at his mother's, a neighbor called to complain that he and the other children were being neglected.

A child-development expert would also have offered information that no family member even hinted at during trial. This information, which Dr. Draper discussed in her report and testimony at post-conviction, would have included the following:

- **Alcohol use**. Vincent was introduced to alcohol at age eleven, when he began to sneak beer and hard liquor from his father's house. By the time he reached age thirteen he was drinking socially with older friends. His maternal grandmother allowed him to drink beer during his teenage years.

- **Experience of death**. Vincent experienced death repeatedly in his youth. When he was thirteen years old his friend Larone Flenoyd died in a car crash. One of his early girlfriends was killed by her then-boyfriend when Vincent was in his teens. A child-development expert could have explained the earth-shattering effect that these deaths and others (*see* Issue 1-1) had on Vincent.

- **Education**. After the third or fourth grade, Vincent constantly changed schools. Sometimes he'd attend multiple schools within a single year. Eventually he was expelled from school in the eleventh grade and didn't return.

Not only would a child-development expert have presented the jury a complete, unitary picture of Vincent's upbringing, but she would have explained the importance of that upbringing to Vincent's life course. For example, she would have explained that Vincent suffered from an attachment disorder that rendered him vulnerable to the sort of gang lifestyle that figured so heavily into his crimes. Had Vincent been guided by a strong, consistent caregiver, or had he not grown up in such a violent or chaotic environment, he would not have committed the crimes he did.

Had the jury received a coherent picture of McFadden's upbringing or an explanation of its importance, it's reasonably likely they would have shown compassion by voting for a life sentence. Instead, the jury received tidbits of information that were too meager to undermine the aggravating factors.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 89–112; Rule 29.15 Appeal Brief at 108–14. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 311–12. That merits determination is contrary to and/or an unreasonable application

43

of the law. The prejudice element is reviewed *de novo. See Rompilla v. Beard*, 545 U.S. 374, 390 (2005). McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 1-8:       Counsel was ineffective for failing to prepare expert testimony.**

Counsel has a duty to adequately prepare their witnesses to testify at sentencing proceedings. In breach of this duty, Kraft and Turlington failed to prepare Dr. Gelbort for his testimony at the first Addison trial. They also failed to prepare Dr. Draper for her testimony at the first Addison trial or the second Franklin trial. This failure had an adverse impact on the second Addison trial because it caused counsel to take a negative view of their witnesses and to omit their powerful mitigating testimony altogether. Had counsel actually prepared their experts in the first place, they would have performed to counsel's satisfaction in the earlier matters and would have presented testimony that is reasonably likely to have led the second Addison jury to a life sentence.

Dr. Gelbort possesses no recollection of having been prepared by either Turlington or Kraft. If he received any preparation, it would have been very terse or minimalistic, and occurred right before the trial. Dr. Gelbort prefers to start prep weeks before testifying. Trial counsel did not engage in extended prep. Any

44

preparation would have been a general overview of expectations, with a minimal review of expected questions. Counsel did not conduct a mock cross-examination.

Counsel likewise failed to prepare Dr. Draper for her testimony at the second Franklin trial. According to Dr. Draper, she flew in and met Turlington and/or Kraft for dinner. After dinner, they spent no more than an hour going through her potential testimony. Dr. Draper does not consider this adequate preparation. Trial counsel did not engage in extended prep. Any preparation would have been a general overview of expectations, with a minimal review of expected questions. Counsel did not conduct a mock cross-examination. Counsel prepared Dr. Draper no more thoroughly before the first Addison trial than before the second Franklin trial.

Had Dr. Gelbort given testimony supported by adequate preparation, it's reasonably likely that the jury at the first Addison trial would have voted for a life sentence because he would have more convincingly presented the evidence of McFadden's brain damage. Likewise, had Dr. Draper given testimony supported by adequate preparation, it's reasonably likely that the jury at the first Addison trial would have voted for a life sentence because she would have more convincingly presented the evidence concerning the lifelong impact of his impaired child development.

Alternatively, failure to prepare these experts from the outset undermines confidence in the outcome of the second sentencing. In Rule 29.15, the attorneys testified that they didn't call either Dr. Gelbort or Dr. Draper at the second Addison trial because they performed poorly at previous hearings. But if Drs. Gelbort and

45

Draper performed poorly, that was the direct result of their under-preparation. Had the attorneys adequately prepared the experts in the first place, their performance wouldn't have underwhelmed them and they would have used them again at the second Addison trial. And, as discussed in Issues 1-3 and 1-7, failure to present the second jury with adequate (or any) testimony about brain dysfunction or childhood development undermines confidence in the death verdict.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Issue 1-9:** **Counsel was ineffective for failing to use Norman White or a similar expert to testify about the effects of being raised in Pine Lawn.**

At trial, the jury learned nothing about what it was like growing up in Pine Lawn during the 1980s and 1990s (with the exception of Elaine Hood's brief mention of shootings in the neighborhood). Professionally reasonable counsel would have presented the testimony of an expert like Dr. Norman White, who could explain to the jury the effects of growing up in an at-risk neighborhood. Without this

46

information, the jury was unable to fully understand the circumstances of the offender or the offense.

Post-conviction counsel presented Dr. White's testimony at the Rule 29.15 hearing. Rule 29.15 Tr. at 632. He would have been able to give the same testimony at McFadden's 2008 trial. Dr. White—who died on December 6, 2017—was a professor of criminology and criminal justice at St. Louis University. White's work focused on at-risk communities and examined what causes youth to become involved in crime. In addition to interviewing McFadden multiple times, he interviewed two prison inmates from the Pine Lawn area, several Pine Lawn residents, and Jamala Harris, who worked in the St. Louis mayor's office in the 1990s to provide youth services in the Pine Lawn area. Dr. White considered Dr. Draper's work from the earlier trials.

Dr. White also participated in the production of a video concerning life in Pine Lawn during the 1980s and 1990s, which the motion court refused to allow into evidence at the Rule 29.15 hearing. The video featured interviews with Rogers as well as with Pine Lawn residents and former residents Lisa Hubbard, Tanesia Kirkman-Clark, Kelly Crowder, Clara Wings, and James Hubbard. These people described prevalence of drugs, violence, and gangs in Pine Lawn during the period in which McFadden grew up.

Dr. White compiled available data about Pine Lawn during McFadden's upbringing. The community had about 5,000 people in 1990 and the population declined thereafter. It was over 90 percent black during the relevant time period.

Unemployment was between 16 and 19 percent. The area had a poverty rate of 22 percent in 1990 and 36.9 percent in 2000. The single-parent-household rate was 42.6 percent in 1990 and 69 percent in 2000.

Based on the demographic data, the personal interviews, and the academic literature, Dr. White explained that McFadden had grown up in an environment in which he was immersed in risk. (In addition to his testimony, the state court considered his report, which is Exhibit 37 of the Rule 29.15 hearing.) Pine Lawn was like a war zone—meaning that physical danger was always at hand, that physical harm had to be met with retaliation to ensure survival, and that vigilance for one's physical safety was constant. McFadden could rarely if ever get a break from this state of heightened awareness and stress. The small neighborhood was carved up into quadrants, and going onto someone else's turf would mean reprisal. School was not a safe space because the gangs of Pine Lawn and surrounding areas would converge there and fight. As McFadden entered middle school he was constantly bullied and had to respond to ensure his survival.

Dr. White acknowledged that a macro-level examination of neighborhoods could have limitations. Many people grow up in such environments, but not all of them offend. What distinguishes those who do from those who don't? Dr. White discussed research looking at individual offenders within high-risk neighborhoods and finding that the most serious offenders "experience a barrage of risk from every quarter of their lives." Rule 29.15 Ex. 37 at 4. This was certainly true of Vincent. In addition to

48

his premature birth and low birth weight—which Dr. White explained has been associated with serious crime later in life, Rule 29.15 Tr. at 483–84—he "exhibited the many challenges that many serious offenders are confronted with," including "difficult home life, academic failure and behavior problems in school, aggressive behavior, peer conflict and delinquent peers, and many of the constellation of predictors that are found to be predictive of delinquency and violence." Rule 29.15 Ex. 37 at 36. In particular, the absence of a parent who could keep him from the violence of the streets rendered him particularly vulnerable to ensnarement in the area's cycle of violence. *Id.* at 37.

In short, the environment in which McFadden grew up had an enormous impact upon his development. His offense would not have occurred had he not been forced to live by the code of the streets to survive. It was objectively unreasonable for counsel to leave the jury without any sense of what it was like to have grown up in Pine Lawn or how that environment shaped McFadden. Had counsel presented Dr. White's thorough examination of the Pine Lawn area and its effect on McFadden, it's reasonably likely they would have shown mercy.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 38–85; Rule 29.15 Appeal Brief at 65–87. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 311.

49

The prejudice element is reviewed *de novo. See Rompilla*, 545 U.S. at 390. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 1-10:   Counsel was ineffective for failing to present lay witnesses to discuss McFadden's experience growing up in Pine Lawn.**

As noted in the previous claim, trial counsel left the jury with a mere crumb of evidence about what it was like to live in Pine Lawn during McFadden's formative years. The only testimony the jury heard about Pine Lawn came from Elaine Hood. And her comments on this topic took up less than a page of trial testimony:

Q:     Now, how would you describe the area of Pine Lawn where you lived?

A:     Well, kind of rough.

Q:     Can you elaborate on what you mean by "kind of rough"?

A:     I did hear all the shootings. That's one of the reasons why I moved. And that's—that's just the main thing.

Q:     So you'd hear a lot of gunshots in the neighborhood?

A:     Yes.

Q:     What would you do when you would hear the gunshots?

A:     Hit the floor.

50

Q:      Did it scare you?

A:      Yes.

Q:      That happened often in that neighbor [sic] where you were, Pine Lawn?

A:      At times, you know. It wasn't an everyday thing. But when it did happen, it was bad.

Tr. 649–50. Counsel was unreasonable for presenting no more than this modicum of evidence about what it was like getting by day-to-day in Pine Lawn. Reasonable counsel would have called other lay witnesses to provide a thorough (and thoroughly disturbing) picture of various factors that made it so difficult to grow up in Pine Lawn in the 1980s and 1990s: poverty, teenage pregnancy, single-parent households without positive role models, police brutality, racist targeting by the police, fighting, crime, wide availability of guns, shootings, drug-dealing, and government corruption. Counsel could have brought the following witnesses, each of whom testified as follows in the post-conviction hearing:

- **Sean Nichols**. Nichols is a principal in the St. Louis County Public Schools. He's familiar with the Normandy School District (where McFadden went to school) and the problems it experienced in the 1980s and 1990s. Gang membership is forced on African-American youths in North St. Louis at an early age. The father is absent from most households, which makes the male children in these families more vulnerable to gangs and increases poverty levels in the community. Nichols's testimony would have been especially powerful

51

because it provided a real-world example of the risks of growing up in an environment like North St. Louis. Nichols was able to succeed because he came from a stable family background in the rural South. Nichols's brother grew up in St. Louis and ended up the victim of gang violence.

- **Elwynn Walls**. Walls is a community activist who owns a barbershop in Pine Lawn and serves on the City Counsel. In the 1980s and 1990s there was lots of poverty, crime, and drugs in Pine Lawn. Normandy High School became known for its violence in this time period. Walls explained that the Pine Lawn police mainly served as a revenue generator and frequently shook down the citizens for money.

- **Tanesia Kirkman-Clark** is a friend of McFadden's. During the 1980s and 1990s drugs and crime transformed Pine Lawn. Many men abused crack or alcohol and positive male role models were few. The area was impoverished. Sixth-grade girls commonly got pregnant. There were daily fights at Normandy High School. You had to pretend you were tough to survive. The police force was known for its brutality and employed officers who had been fired from other forces. They had a reputation for framing people and stealing. They also shot people. Kirkman-Clark was herself harassed by the police because she was driving a so-called "gang car."

- **Lisa Thomas** is McFadden's cousin and spent a lot of time with him growing up. They had male friends who were shot and killed. McFadden tended to look up to older youths. Thomas explained the problems with crime, shooting, gun access, and drug dealing during the 1980s and 1990s.

- **Willebea Blackburn** has lived in Velda Village, a township adjoining Pine Lawn, since 1970. Her grandson, who was friends with McFadden, attended Normandy High School. He was killed in Pine Lawn.

Counsel's perfunctory and constitutionally deficient presentation of Pine Lawn evidence through Hood prejudiced McFadden. Had counsel presented a meaningful picture of the environment that McFadden struggled to survive in, it's reasonably likely that the jury would have given him a life sentence.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 85–89; Rule 29.15 Appeal Brief at 88–99. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 310–11. That merits determination is contrary to and/or an unreasonable application of the law. The prejudice element is reviewed *de novo. See Rompilla*, 545 U.S. at 390. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e)

53

doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 1-11:** **Counsel was ineffective for failing to request that the jury view the crime scene.**

Counsel should have requested that the jury be taken to view the crime scene and the area of Pine Lawn in which McFadden was raised. While a jury view cannot replace testimony, the trier of fact may take a jury view to enable it to understand the evidence. A jury view illustrates the evidence and provides a base for understanding and comprehending testimony. Defense counsel had no reason for not requesting a jury view.

This area of Pine Lawn remained sufficiently similar to its appearance at the time of the offense to assist the jury in understanding mitigation and guilt issues in this case. A jury view of Pine Lawn would have illuminated the mitigation testimony offered regarding the Pine Lawn environment. Further, it would have illustrated the relative distances between locations discussed by witnesses and the general geographic layout of Pine Lawn.

Because the jury view would have assisted the trier of fact, counsel was ineffective for failing to request it. A jury view was necessary if jurors were to understand the mitigation theory regarding Pine Lawn; the general geographic layout of Pine Lawn was critical for jurors to understand and evaluate McFadden's challenge to Eva Addison's testimony.

Counsel's failure to request a jury view rendered the sentencing trial fundamentally unfair and the death sentence unreliable. Had the jury actually experience the area in which McFadden was raised they would have better grasped the case for mitigation and likely would have returned a life sentence. The Court should order a new penalty phase as a result.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Issue 1-12:      Counsel was ineffective for not presenting a trauma expert.**

Up to the point of his conviction, McFadden's life was marked by trauma, which included being raised in some of St. Louis's most impoverished and violent neighborhoods by a single, often neglectful mother. A drug-addicted, alcoholic father failed to fill this gap. McFadden's exposure to violence, poverty, and neglect continued throughout his development period. Violence, abuse, neglect, and mental illness were also consistent themes within McFadden's family and these traumatic experiences heavily affected his development and decision-making abilities as a child and young adult. These effects were present at the time of his arrest and trial, and

55

persist today. Due to multiple repeated failings on the part of McFadden's attorneys, the trauma of long-term exposure to violence and poverty, and the resulting effects of that trauma on his decision-making abilities was never explained to the jury that sentenced him to death.

Trial counsel took minimal steps to investigate McFadden's exposure to trauma through violence and poverty, failed to investigate this trauma's effects on his development and neurological deficits, failed to hire the appropriate experts to assist in such an investigation, and did nothing to present to the jury what few facts they did have regarding McFadden's troubled history of exposure to trauma and resulting mental-health issues. A review of facts and information discovered through independent investigation makes clear that, had the jury heard this compelling mitigation evidence, McFadden likely would not have been sentenced to death.

Had counsel for McFadden conducted the requisite investigation, counsel readily would have discovered evidence that the violence to which McFadden was exposed as a child and young adult was so pervasive in McFadden's hometown of Pine Lawn that children were afraid to walk to nearby schools. If children did not have a ride, even for short distances, they did not go to school because of the street violence. As a teenager McFadden had several friends killed by gun violence. At times McFadden would wake up in the night screaming because of the violent deaths of his friends. Because of McFadden's family's poverty he was not able to escape the distressing violence found in his neighborhood.

56

Trial counsel would have further found that police corruption in these neighborhoods allowed this violence to flourish. The Pine Lawn Police did not provide the protection needed for a safe community. For the most part, Pine Lawn police officers were not qualified for their job of patrolling the streets and protecting against violence. A number of the Pine Lawn officers had been sent to Pine Lawn as discipline for discriminatory practices in other police forces in the St. Louis area. The supposed peacekeepers' abdication of their role allowed McFadden to be exposed to violence that was so severe as to cause trauma.

Other contributors to the violence that confronted McFadden included the rise of gangs in the unpoliced or inadequately policed neighborhood where McFadden was raised. The violence these gangs spawned was so widespread that a person could not wear certain colored clothes without risking being killed. This included children. A person could not walk more than four blocks without risk of being killed, so pervasive was the problem.

McFadden was exposed to violence not only on the street but also in the seemingly safe environment of his schools. He was exposed to violence from teachers and fellow students. Ultimately, McFadden changed schools at least eight times by the time he was in junior high.

Defense counsel deficiently failed to engage an appropriate expert to explain to the jury how a lifetime of exposure to the trauma of violence and poverty can have long-term effects on a person, how certain persons, such as McFadden, are more

57

susceptible to the debilitating effects of trauma, and how the trauma of lifelong exposure to violence and poverty can affect a person's ability to make rational and knowing choices, including whether to join the gangs perpetrating the violence to the community. Even if trial counsel had engaged the appropriate expert, because of their failure to investigate McFadden's history of trauma they would not have been able to present evidence of violence and poverty to that expert.

McFadden was greatly prejudiced by counsel's errors because he was sentenced to death by a jury that was deprived of testimony from an expert who could detail his unique history with trauma as well as explain how it affected his decision-making both during the time of his offense and at trial. The jury's failure to learn of this information undermines confidence in the death sentence.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Issue 1-13:**     **Counsel was ineffective for failing to present evidence that Vincent didn't assault or seriously injure Daryl Bryant and Jermaine Burns.**

The aggravating circumstances at trial consisted of six prior convictions. Four of these convictions arose out of an incident on April 4, 2002, in which a shooter attacked the van that Daryl Bryant and Jermaine Burns were driving in. McFadden was convicted for these four charges. At trial, the State entered records of the convictions as well as the testimony of Shonte Addison, the sister of the victim in this case. Shonte testified that she came home from work on the date in question to find Burns and Bryant in a van in her driveway. McFadden saw them, approached the van, pointed a gun at Bryant, and said he was going to kill him. Bryant and Burns left, and then McFadden and a friend left in a car. Shonte heard gunshots then went to the scene, where she saw the van with its windows shot out. The van then went to a hospital, and Shonte followed. At the hospital Bryant "had a big hole in his side, a lot of blood." Tr. at 627.

There was evidence to show that McFadden was not the shooter in this incident. Moreover, Shonte had motive to lie—McFadden was accused of killing her sister— and there was also evidence to undercut her unreliable testimony. The available evidence was as follows:

- According to police reports, McFadden was standing at the front of the van. Burns was shot not in the front but in the back—in the buttocks, specifically. Additionally, the path of the bullet showed that it entered from the back of the

59

van instead of the front. McFadden could not have shot from the back of the van when he was at the front.

- Another person admitted to being the shooter. Specifically, shortly after the shooting Kyle Dismukes told his brother, Michael Douglas, that he shot into the van.

- Available medical records refute the gravity of the wound as Shonte portrayed it. Bryant was ambulatory upon discharge and sustained only an abrasion. There was no exit wound or foreign object lodged within the part of the body where Bryant was shot. He remained at the hospital for less than two hours.

Counsel was ineffective for failing to perform the investigation that would have undermined McFadden's identity of the Bryant shooter. By providing affirmative evidence that McFadden wasn't the shooter, or at the very least undermining the harmful testimony of Shonte Addison, counsel would have undercut four of the six aggravating circumstances in this case. And had the jury not weighed those aggravators, there's a reasonable probability that it would have returned a sentence of life without parole.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 130–41; Rule 29.15 Appeal Brief at 142–48. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the

Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 315–16. That merits determination is contrary to and/or an unreasonable application of the law. The prejudice element is reviewed *de novo*. *See Rompilla*, 545 U.S. at 390. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 1-14:** **Counsel was ineffective for failing to object to unredacted copies of Vincent's prior offenses.**

During the penalty phase the prosecutor introduced, as non-statutory aggravating evidence, two sets of documents related to two convictions McFadden obtained as a juvenile. These documents contained prejudicial information that reasonable counsel should have sought to redact.

The documents appear in the Rule 29.15 record as Exhibits 38 and 39. One set of documents concerns a 1997 conviction for possession of cocaine base and unlawful use of a weapon. The criminal complaint alleges that McFadden possessed a gun that was concealed and loaded with live rounds. Rule 29.15 Ex. 38 at 13. The second set of documents concerns a 1996 conviction for third-degree assault. The papers include pleadings from juvenile court alleging that McFadden struck the victim "about the head and body thereby resulting in contusions to the head and a broken bone in the nose." Rule 29.15 Ex. 39 at 17. They show that the case was removed from juvenile

61

court because of the "vicious, forceful, and violent nature of the offense alleged." *Id.* at 11. They also assert that the conduct was "part of a repetitive pattern of offenses"—though the jury heard of no offenses earlier than this one—showing that McFadden "may be beyond rehabilitation under the juvenile code." *Id.*

Counsel was ineffective for not seeking to redact the forgoing information from the juvenile pleadings. Counsel had successfully redacted the prejudicial fact that he received a prior death sentence for the Franklin murder. They should have likewise sought to redact the juvenile pleadings. The trial court had permitted the defense to redact McFadden's death sentence in the Franklin case from documents the State introduced about that case. It likewise would have permitted redaction of the juvenile documents.

This information in the juvenile documents was highly prejudicial. It tended to suggest McFadden was incorrigibly violent from an early age. This aggravation undercut the limited favorable information counsel had presented about McFadden's upbringing. Indeed, the jury placed great emphasis on the prior convictions, as they requested (and received) the documents during sentencing deliberations. Tr. R. at 824–25. Had the jurors not learned the damning facts of McFadden's juvenile conduct, it's reasonably likely they would have found him worthy of life.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 142–50; Rule 29.15 Appeal Brief at 100–07. This

claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 315. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

> **Issue 1-15:**    **Counsel was ineffective or failing to object to the prosecutor's improper arguments.**

In his penalty-phase closing argument, the prosecutor made several improper arguments that unfairly commented on McFadden's exercise of trial rights and that were geared to inflame the jury's emotions. At one point he argued the following:

> And on that day that he killed Todd, on the following May, there was one juror in Pine Lawn. That juror was the foreperson. He had no instructions of law. There were no jury instructions. There was no evidence. There were no witnesses. And that foreperson and that juror decided that the death penalty was appropriate then and that Todd and Leslie should not get a fair trial. Because if there's one person in this courtroom that believes in the death penalty, it's that man right there.

Tr. at 810. By suggesting that McFadden deprived his victims of evidence, witnesses, and an appropriate jury determination of sentence, the prosecutor offered a negative inference about McFadden's exercise of these rights—namely, that he had no business exercising them. Later the prosecutor pleaded with the jurors to "love" Franklin and Addison by giving McFadden the death penalty:

> Ladies and gentlemen, I leave you with Leslie and Todd. Hold them. Hug them. Tell them you love them. But most of all, don't let them down. This verdict is for Leslie and Todd. . . . And there can only be one conclusion. This case deserves the death penalty. Stand firm.

Tr. 822–23. This argument improperly inflamed the jury's emotions by inappropriately suggesting that the jurors' "love" for the victims—an improper sentencing factor—required them to return a death verdict rather than life without parole.

Defense counsel had no reason for not objecting to these comments. By failing to protect their client from this invective, they rendered the sentencing trial fundamentally unfair and the death sentence unreliable. The Court should order a new penalty phase as a result.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 150–161; Rule 29.15 Appeal Brief at 100–07. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 316–17. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

64

**Claim 2:       Counsel was ineffective at the guilt phase.**

For the reasons stated in following sub-claims, McFadden's counsel performed deficiently at the guilt phase of his trial and in a manner that prejudiced him, thus depriving him of the right to counsel guaranteed by the Sixth Amendment.

**Issue 2-1:        Counsel was ineffective for failing to investigate and present evidence about Eva Addison's inability to see the murder.**

McFadden's conviction is based primarily on the eyewitness testimony of Eva Addison, the victim's sister and the mother of McFadden's child. According to Eva, on the night of the murder McFadden had several heated encounters with the Addison sisters at 31 Blakemore in which he told them to get out of Pine Lawn. He hit Eva in the face. He pulled a gun on Leslie and pulled the trigger but it didn't go off. Eva testified that Arnell Jackson saw this happen. According to Eva, McFadden came to 31 Blakemore three times that evening, twice driven in a car and the third time on foot. After the last time, McFadden ran down an alleyway when he heard police sirens. After these encounters, Leslie left the house to use a pay phone at a nearby roller skating rink. Eva ran after her and saw McFadden approaching in a car. She went and hid in some bushes. From this vantage point she saw McFadden shoot Leslie.

All this happened close to midnight when it was very dark. The jury heard some evidence about how dark it was. While there were some streetlights in the general vicinity, there were none in the area where Leslie was killed. An investigator testified

65

that he had to use artificial illumination to get a good look. Stacy Stevenson, who saw a man arguing with Leslie but not the shooting itself, said he couldn't identify the man because it was too dark. The jury heard nothing about the distance separating the bushes in which Eva hid and the place where Eva was shot.

Counsel performing reasonably under the circumstances would have presented evidence that Eva was too far from the scene and the lighting in the area was too poor for her to actually have identified the person who shot Leslie. At the post-conviction hearing McFadden presented evidence that the bushes were 200 feet from the crime scene—two thirds of the length of a football field and far too distant for a reliable identification, particularly in that state of darkness. Trial counsel could have and should have illustrated this point by presenting additional evidence, as PCR counsel did at the post-conviction hearing, that there was simply no lighting at the spot where Leslie was killed. Had counsel undercut the only eyewitness's identification of McFadden, it's reasonably likely that the jury would have acquitted, particularly given the dearth of any other direct evidence against him.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 31–35; Rule 29.15 Appeal Brief at 149–55. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 307–08. That merits determination is contrary to and/or an unreasonable application

66

of the law. The prejudice element is reviewed *de novo. See Rompilla*, 545 U.S. at 390.

McFadden seeks an evidentiary hearing insofar as the Court determines that the state

court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e)

doesn't bar such a hearing because McFadden developed the factual basis of this claim

in state court.

> **Issue 2-2:** **Counsel was ineffective for failing to impeach the single eyewitness to the crime.**

As noted in the previous claim, Eva Addison was the only eyewitness to the

shooting. Obviously her credibility was of paramount importance to the jury's

determination of McFadden's guilt. Reasonable counsel would have performed a

thorough investigation into witnesses who could impeach Eva's story. Had they

performed an adequate investigation counsel would have identified and presented

testimony from the following witnesses:

- **Maggie Jones**. Maggie Jones owned the house at 31 Blakemore, at which McFadden was said to have confronted the Addisons. She was home the night of the murder. However, Jones heard no disturbance between McFadden and the Addisons that night. Jones testified at the first Addison trial and easily could have testified again.

- **Arnell Jackson**. Jackson was present at 31 Blakemore the night of the murder. Contrary to Eva's testimony, he didn't see McFadden pull a gun on Leslie. Nor did he see McFadden hit Eva. Jackson also followed McFadden

when he left 31 Blakemore by car and didn't see him get out, thus calling into question that he returned to 31 Blakemore by foot, as Eva testified. Jackson was incarcerated at the time of trial. Counsel talked to him briefly by phone but didn't interview him in person.

- **Margaret Walsh**. Walsh was a forensic scientist with the St. Louis County Police Department crime lab. She performed blood analysis of McFadden's clothing and found no evidence of blood. She could have been easily located before trial.

Counsel's failure to investigate and call these witnesses prejudiced McFadden. Had Jones or Jackson testified, they would have effectively attacked Eva's credibility and the jury would likely have discredited her testimony to acquit McFadden. Likewise, the jury would have likely acquitted McFadden had it learned that his clothing was tested for blood but no blood was found. This, too, would have undercut Eva's testimony that McFadden was the shooter.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 22–31; Rule 29.15 Appeal Brief at 134–41. The performance element of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 305–07. That merits determination is contrary to and/or an unreasonable application of the law. The prejudice element is reviewed *de novo. See Rompilla*, 545 U.S. at 390.

68

McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden developed the factual basis of this claim in state court.

**Issue 2-3:    Counsel was ineffective for failing to object to improper closing argument.**

Trial counsel failed to object to multiple instances of prosecutorial misconduct during the State guilt-phase closing arguments. Each of the following arguments was improper:

- During the trial, the prosecutor attempted to illustrate the quality of Eva Addison's eyesight by having her read from a clock in the courtroom. But Eva read the clock incorrectly:

  Q:    What time does the clock say in the back of the room?

  A:    10:18. Is it 10:18? 10:18. It's not 10:18?

  Q:    Well look at it.

  A:    Oh. It's 11:18. I'm sorry. Is it 11:18?

  Q:    Don't ask me. Tell me. What is it?

  A:    It's 11:18.

  Q:    Okay. You said 10:18 for a second there. All right, 11:18.

  Tr. 71–72. In closing, the prosecutor tried to prop up his witness: "A lot's been made of Eva's eyesight. She hit a glare on the screen, whatever, and couldn't

tell 10:30 from—or 10:18 from 9:18 or 11, whatever it was. Sit in the chair. A little glare there." This argument improperly bolstered Eva's testimony by suggesting a "glare" or "whatever" that wasn't supported by the record. Eva simply did not see the time correctly, and it was improper for the prosecutor to argue otherwise.

- The prosecutor imagined McFadden's thought process during the crime: "I can really shoot this woman right in the face, right in the middle of the face. I can point that gun at her face. I can really ruin this woman's face. You know? What's the worst place to shoot a woman? The worst place you can think of to shoot a woman? Right in the middle of the face." Tr. 358. These comments improperly inflamed the jurors.

- The prosecutor later imagined Leslie's thought process during the crime: "Why does Leslie go to the Skate King? I'll answer all her questions. First of all, Leslie is not here to tell you. Here's what she would say if she was here . . . I'll speak for Leslie." Tr. 396. This testimony was also improperly inflammatory.

- The prosecutor incorrectly stated the law when characterizing defense counsel's argument: "You heard the defense argument: He didn't do it. But if he did, it's murder second degree. You heard the argument. That's a bunch of B.S. You come back with murder first degree or you don't come back." Tr. 400. Contrary to the prosecutor's comment, the jury didn't have an all-or-nothing

70

choice. Had they determined McFadden didn't coolly deliberate, they could have returned a verdict of second-degree murder.

Counsel had no reasonable basis for failing to object to comments that improperly vouched for a witness, that inflamed the jurors' emotions, and that misstated the law. Had counsel objected to this repeated misconduct, there's a reasonable likelihood that the jurors would have returned a verdict of less than first-degree murder.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to fairly present it to the state courts. Though he raised it in his state post-conviction petition, *see* First Amended Rule 29.15 Motion at 35–38, he failed to raise it in his appeal to the Missouri Supreme Court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

### Issue 2-4:  Counsel was ineffective for failing to raise mental-health issues in the guilt phase.

As already alleged, counsel failed to perform an adequate investigation into and presentation of McFadden's mental problems. *See* Issues 1-3, 1-4, 1-5, and 1-6. This failure prejudiced McFadden in the guilt phase as well as in the penalty phase. Had the jury known of McFadden's brain abnormalities—specifically, his diminished abilities

71

in the areas of brain functioning that regulate emotion and thinking—they would have found that he was incapable of forming the cool deliberation that Missouri law requires for a conviction of first degree-murder. And had the jury so found, McFadden would have been convicted of a lesser offense that carries a sentence less severe than life without parole or the death penalty.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Claim 3:      Counsel was ineffective at voir dire.**

For the reasons stated in following sub-claims, McFadden's counsel performed deficiently during the voir dire of his trial and in a manner that prejudiced him, thus depriving him of the right to counsel guaranteed by the Sixth Amendment.

**Issue 3-1:        Counsel should have investigated and moved to exclude Juror Williams.**

At voir dire, seated juror Jimmy Williams was asked whether he recognized McFadden. Williams denied recognizing him. But as it later emerged, Williams had been a venire member at McFadden's trial for the assault of Daryl Bryant and

72

Jermaine Burns. That trial produced two convictions for assault and two convictions for armed criminal action that served as aggravators to the Addison murder. The prosecutor informed the Addison venire members of these convictions. However, because of his service on the Bryant/Burns venire, Williams had additional knowledge that the other Addison venire members lacked: McFadden had originally been charged for an additional count of assault and an additional count of armed criminal action in the Bryant/Burns case. (McFadden wasn't convicted on these charges.) This knowledge of additional charges rendered Williams biased against McFadden because it informed him of bad acts that were not in evidence—information that Williams may have spread to other jurors.

When Williams appeared at the Addison voir dire, McFadden informed his trial counsel that Williams looked familiar (though McFadden wasn't sure where he remembered Williams from). The trial court asked Williams whether he knew McFadden and Williams said no. Trial counsel took no additional steps to question Williams about his familiarity with McFadden or to investigate whether he might have encountered McFadden at prior legal proceedings. When appellate counsel examined the venire list for the assault trial, she found that Williams had been in that venire.

Trial counsel acting reasonably under the circumstances would have heeded their client's recognition of a juror by questioning the juror more thoroughly and by taking the relatively easy step of investigating the client's prior court proceedings. Had they done so, they would have found that Williams was biased by his participation in the

73

Bryant/Burns venire. Thus, trial counsel performed deficiently to McFadden's prejudice. McFadden is entitled to be retried by a jury untainted by a biased juror.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* First Amended Rule 29.15 Motion at 14–22; Rule 29.15 Appeal Brief at 59–64. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 553 S.W.3d at 304–05. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d). Section 2254(e) doesn't bar such a hearing because McFadden was diligent in seeking to develop the factual basis of this claim in state court.

**Issue 3-2:    Counsel was ineffective for failing to rehabilitate witnesses who expressed qualms about the death penalty.**

Voir dire proceeded in two stages. In the first stage, the attorneys asked questions about the potential jurors' scheduling conflicts and views on the death penalty in an attempt to determine who should be eliminated for cause. At the second stage, the attorneys asked additional questions and then exercised peremptory strikes. There were 159 jurors questioned during the first stage and 48 qualified for questioning at the second stage. Among the 159 jurors, 61 were excluded for inability to impose the death penalty.

A juror may be excluded from the jury pool if her views on the death penalty substantially impair her ability to follow the law. Trial counsel did essentially no probing into the jurors' views to determine whether they could properly apply the law despite any hesitation they may have concerning the death penalty. Counsel had a duty to rehabilitate jurors who expressed concern about a death verdict. Instead, counsel simply relied on juror questionnaires without probing further in voir dire. For example, Venireperson Ellis-Irvin gave contradictory answers to the State's questions about the death penalty:

> Q:    Ma'am, I believe in your questionnaire you indicated that you would be unable to consider a death sentence in any case, is that true?
>
> A:    Yes.
>
> Q:    So that if you're at the third door, which is the death penalty door, in all cases you would be unable to consider the death penalty for the defendant?
>
> A:    Yes.
>
> Q:    Would you automatically vote for life without parole?
>
> A:    No.
>
> Q:    You wouldn't vote for that either?
>
> A:    No.
>
> Q:    Would you be able to set aside your views and consider the two sentences in this case, or would you be unable to do that?
>
> A:    I would be unable to do it.

Tr. Vol. IV at 91. Reasonable counsel would have explained to Ellis-Irvin how sentencing deliberations function, would have clarified that a choice between sentences is required, and would have examined whether she could apply a death sentence in some circumstances. Instead counsel asked no questions and simply assumed from this brief colloquy that the juror was substantially impaired.

Had counsel acted reasonably by attempting rehabilitation, Ellis-Irvin and others would have been qualified to sit on the jury. The denial of eligible jurors rendered the trial fundamentally unfair without a showing of prejudice. Alternatively, had Ellis-Irvin and other jurors been rehabilitated there's a reasonable probability that McFadden would have received a life sentence.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

76

**Issue 3-3:**     **Counsel was ineffective for failing to pursue a fair-cross-section claim.**

Despite their awareness that African Americans were underrepresented on his venire, counsel failed to pursue the evidence necessary to show that African Americans were systematically excluded from St. Louis County jury pools. Had they done so, they could have brought a successful fair-cross-section claim. Counsel's unreasonable failure to protect their client's Sixth Amendment right to be tried by a fair cross section rendered the trial fundamentally unfair.

During the initial stage of voir dire, the attorneys questioned 159 jurors. In the process they sought to make a record of each venireperson's race. The record shows that this venire consisted of 62 white females; 58 white males; 20 black females; 10 black males; one female of another race; three males of another race; and five jurors of unidentified race. After the jury was empaneled, using slightly different numbers, counsel moved to quash the jury panel because 170 jurors were called and only 29 were black. Tr. Vol. 5 at 238–39. The court denied the motion, finding that this was "just a normal juror panel that was selected from randomness from St. Louis County and that's the number of African-Americans that was received on this panel." *Id.* at 240. Counsel offered no additional evidence that African Americans are systematically excluded from St. Louis County jury pools.

Counsel's failure to develop this claim, or to request discovery to do so, was unreasonable. The numbers showed that African Americans were underrepresented in

77

McFadden's jury pool specifically. Using the numbers most favorable to the State, the venire was 18.9% African American (159/30). The African-American population of the county as a whole, according to number counsel quoted at trial, was 21.4 percent African American. This created an absolute disparity of 2.5 percent and a comparative disparity of 11.7 percent (21.4 - 18.9 ÷ 21.4). The Missouri Supreme Court quoted numbers more favorable to McFadden—21.8 percent black population and 17.8 percent prospective black jurors—which are more relevant for an assessment of counsel's performance in light of what they knew at the time. *See McFadden II*, 391 S.W.3d at 429. Using these more favorable numbers, the absolute disparity and comparative disparity are even greater: 4 percent and 18.3 percent, respectively.

These numbers were significant enough for counsel to have pursued evidence—such as statistics from other venires or materials concerning the county's jury-selection methods—to show systematic exclusion. Counsel will request discovery to perform the investigation that trial counsel should have performed.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Claim 4:**     **Counsel should have moved to suppress evidence that Vincent was found with drugs at his arrest.**

Counsel's failure to suppress evidence arising from his illegal arrest violated his Sixth Amendment right to counsel. McFadden's arrest violated the Fourth Amendment because it was conducted without a warrant, in a hotel room in which McFadden had a reasonable expectation of privacy, absent exigent circumstances or consent. Detective Michael Akers, one of the arresting officers, testified about the circumstances of the arrest at trial. Tr. 266–68. On May 17, 2003, having learned that McFadden was staying at a Travel Lodge, Akers and another officer went to his room posing as hotel workers. They were dressed in plain clothes and pretended to require signature on a hotel receipt. McFadden "opened the door about six to eight inches," at which point Akers "pushed the door open and took him into custody." Tr. 288. At sentencing, Akers testified that upon McFadden's arrest he found seventeen small bags of crack cocaine in McFadden's pants. Tr. 572–74. The crack cocaine was entered into evidence as an exhibit.

Counsel performing reasonably under the circumstances would have recognized that McFadden's arrest violated the Fourth Amendment and would have filed a motion to suppress evidence arising from the arrest. Had they done so, the crack cocaine, and testimony about it, would have been suppressed as fruit of the poisonous tree. Evidence of the crack was prejudicial to McFadden because it portrayed him to the jury as a continuing criminal menace. Had the jury not learned that McFadden was

79

continuing to possess drugs with intent to sell after the Addison murder, and had they not weighed that information in aggravation, there's a reasonable likelihood that they would have returned a life sentence.

\*\*\*\*\*

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013). 2254(d) has no application to this claim.

**Claim 5:**   **The seating of Juror Williams denied McFadden an impartial jury and due process, in violation of the Sixth and Fourteenth Amendments.**

As stated in Issue 3-1, juror Jimmy Williams was biased by his participation in the venire of McFadden's assault case. Participation in the venire gave him information about McFadden's prior bad acts that he otherwise would have lacked. The state post-conviction court held a limited hearing at which it questioned Williams and Erin Elswick, another seated juror whom the court selected at random. Williams denied that he actually remembered McFadden from the assault case. Elswick denied having heard anything about McFadden from Williams. Neither could speak to the knowledge of the other ten jurors. The state post-conviction judge denied McFadden's motion to question additional jurors. This judge (Judge Goldman)

80

subsequently recused from the case because he thought he'd likely discussed its facts with the prosecutor at the time of the trial. Had McFadden received an adequate hearing on this issue he would have shown that Williams's participation in the Bryant/Burns case biased him against McFadden in the Addison murder case.

*****

Counsel raised this federal-due-process claim on direct appeal, though for plain error because trial counsel had not raised or developed the issue. *See* Direct Appeal Brief at 46–49. The Missouri Supreme Court denied the claim by relying on a state-law distinction between intentional and unintentional non-disclosure. *McFadden II*, 391 S.W.3d at 417–19. Post-conviction counsel raised this claim again in the Rule 29.15 motion. *See* First Amended Rule 29.15 Motion at 5–13. On appeal, PCR counsel did not articulate a due process claim but instead focused on the denial of an adequate hearing on the issue in state post-conviction. *See* Rule 29.15 Appeal Brief at 43–58. Assuming the claim is defaulted, McFadden is entitled to a hearing on whether there is cause and prejudice to excuse the default. Section 2254(e)(2) permits hearings on excuses to overcome procedural defenses. *See Cristin v. Brennan*, 281 F.3d 404, 412–19 (3d Cir. 2002).

**Claim 6:**    **The exclusion of jurors Brunetti, Behrens, and Stevens violated the Sixth Amendment.**

Exclusion of jurors Brunetti, Behrens, Stevens violated McFadden's right to a fair and impartial jury under the Sixth and Fourteenth Amendments. A death sentence is invalid "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The governing standard is whether a juror's views substantially impair her ability to follow the law. Absent substantial impairment, exclusion of jurors for doubts about capital punishment violates the defendant's rights. The trial court's exclusion of three jurors violated this standard:

- **Brunetti.** Brunetti said that she could realistically apply both death and life without parole. Tr. Vol. 4 at 160–61. Asked whether she could sign the verdict form as foreperson, she first said, "I don't know how to answer that. I mean, I've never been in a circumstance like this." *Id.* at 160. She then said she would not be able to sign the form "at this point" but she'd be able to announce in open court that she voted for the death penalty. *Id.* at 161.

- **Stevens.** Stevens said she could vote for either death or life without parole. Tr. Vol. 3 at 112. When first asked, she said she could sign the death verdict as foreperson. *Id.* at 114. When asked again, she said she was "not real sure." *Id.* at 115. When asked a third time she said she could neither sign the form nor

82

announce her verdict in open court. *Id.* at 116. Asked by defense counsel to clarify about signing the form, she said, "I could do it as group. I wouldn't want to be like the lead person. . . . I suppose I could do it but I wouldn't want to." *Id.* at 118, 120. Asked by the prosecutor to give a "final answer" about whether she could sign the verdict form and announce her verdict in open court, Stevens said "no." *Id.* at 126.

- **Behrens.** When asked whether he could vote for the death penalty, Behrens responded that he was "pretty sure but that's kind of a hard thing to ask." Tr. Vol. 1 at 240. He would have to consider remorse but if the mitigators didn't outweigh the aggravators "I would probably go with the death sentence." *Id.* at 240–41. He would be able to vote for the death sentence if there were no evidence about remorse either way. *Id.* at 245. However, Behrens said he would not be able to sign the death verdict as foreperson or announce his death verdict in open court because "I would feel more responsibility." *Id.* at 248, 251.

In each of these three cases, the juror was excluded not because her ability to impose a death sentence was substantially impaired but rather because she didn't want to fulfill a procedure memorializing the verdict. Striking jurors who could impose death violated McFadden's rights. The violation is especially clear for a juror, Brunetti, who said she could announce her verdict openly and who was unlikely to be required to sign the verdict form in the first place.

83

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 58–61. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W.3d at 419–20. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 7:    The trial court violated Vincent's Sixth Amendment rights by finding that his prior convictions were "serious assaultive" instead of submitting this factual issue to the jury.**

At the sentencing phase, the trial court did not require the jury to determine that McFadden's prior convictions were "serious assaultive." Because the "serious assaultive" nature of the prior offenses was a fact that increased McFadden's punishment, this procedure violated McFadden's right to trial by jury.

The State raised one statutory aggravating circumstance under Missouri law: that "the offense was committed by a person with a prior record of conviction for murder in the first degree, or the offense was committed by a person who has one or more serious assaultive criminal convictions." Rev. Stat. Mo. § 565.032.2(1). The State charged six separate iterations of this aggravating circumstance: one for each conviction arising from the killing of Todd Franklin and the shooting of the van that carried Jermaine Burns and Daryl Bryant. Over defense objection, the trial court refused to submit to the jury the question of whether these convictions qualified as

84

"serious assaultive." Instead the court merely submitted to the jury the question of whether McFadden was convicted of the six charges at issue. Tr. 761–62.

The Sixth Amendment required more. Whether a particular conviction is "serious" or "assaultive" is a question of fact that the jury must find. Had the jury been required to assess this question of fact, few of the prior convictions would have qualified. Three of the convictions were for armed criminal action—a charge appended onto a substantive offense indicating that the defendant using a gun during the offense. Using a gun is not "assaultive." Moreover, it's unlikely that the jury would have found the Burns/Bryant incident to be "serious," given that Bryant's injury was minor and Burns wasn't injured at all. Because the trial court's instructions on the aggravators violated the Sixth Amendment, McFadden's sentence should be vacated.

\*\*\*\*\*

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 62–68. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W. 3d at 420. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 8:**    **The trial court's penalty-phase instructions violated the right to jury sentencing under the Sixth Amendment and the right to a reliable capital sentencing under the Eighth Amendment.**

The trial judge's sentencing-phase instructions did not require the jury to find non-statutory aggravation beyond a reasonable doubt and did not require the jurors to find that aggravation outweighed mitigation by a reasonable doubt. These instructions violated McFadden's right to jury sentencing under the Sixth Amendment and right to reliable capital sentencing under the Eighth Amendment.

The trial court instructed the jury as follows:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 21 exists, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment.

> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of the trial, including evidence presented in support of statutory aggravating circumstances submitted in Instruction Number 21, and evidence presented in support of mitigating circumstances submitted in this instruction.

> *****

> If you unanimously decide that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, then the defendant must be punished for the murder of Leslie Addison by imprisonment of for life by the Department of Corrections without eligibility for probation or parole, and your foreperson will sign the verdict form so fixing the punishment.

Tr. 763, 765. This instruction allowed the jury to consider various items of non-statutory aggravating evidence. For example, it allowed them to consider that Gary

86

Lucas fled to Dallas because he feared McFadden would kill him, and that McFadden had crack cocaine on his person when he was arrested. The court never instructed the jury what burden of proof it should allocate to this un-adjudicated bad-acts evidence.

Trial counsel offered the following alternative instruction:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 21 exists, you must then determine whether there are facts or circumstances in mitigation of punishment and, if so, whether the aggravating circumstances that you, unanimously and beyond a reasonable doubt have found to exist, outweigh the mitigating circumstances.

> The state bears the burden of proving beyond a reasonable doubt that the aggravating circumstances that you have unanimously found outweigh the mitigating circumstances.

> In deciding whether there are facts and circumstances in mitigation of punishment, you may consider all of the evidence presented in both the guilt and the punishment stages of trial. However, the only aggravating evidence that you may consider in determining whether the aggravating evidence outweighs the mitigating evidence is that aggravating evidence that you have unanimously and beyond a reasonable doubt found to exist.

> You shall consider all other facts or circumstances which you find from the evidence in mitigation of punishment. It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. In weighing the aggravating and mitigating evidence, each juror must decide, individually, what mitigating evidence exists. However, the only aggravating evidence that may weighed against the mitigating evidence is the aggravating evidence that all jurors unanimously find to exist beyond a reasonable doubt.

> If all the jurors do not agree that the state has proved beyond a reasonable doubt that the evidence in aggravation of punishment outweighs the evidence in mitigation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Direct Appeal LF 684-85. This instruction ensured that McFadden's jury would only consider aggravating evidence that the jury had found beyond a reasonable doubt and that the jury would find beyond a reasonable doubt that the aggravators outweighed the mitigators. This instruction would have given the jurors appropriate guidance and would have preserved McFadden's rights. Instead, the instruction violated the Sixth Amendment by allowing the jury rely on facts that it had not found beyond a reasonable doubt. It likewise violated the Eighth Amendment by producing an unreliable death sentence. The Court should vacate the death sentence as a result.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 69–79. The Sixth Amendment portion of this claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W.3d at 420. That merits determination is contrary to and/or an unreasonable application of the law. The Missouri Supreme Court did not adjudicate the Eighth Amendment portion of this claim on the merits so it is reviewed *de novo*. McFadden does not seek an evidentiary hearing on this claim.

88

**Claim 9:      Prosecutorial misconduct during trial violated due process.**

The closing arguments by prosecutor Keith Larner at guilt and penalty are textbook examples of how *not* to present closing argument in a capital case. Among other things, Larner's statements relied on facts not in evidence; commented negatively on McFadden's exercise of his constitutional rights; injected his own personal opinions about the propriety of death and the worthlessness of mitigation; urged the jury to "send a message"; and appealed to the jury's most negative emotions through impermissible attacks on McFadden. Because the arguments violated McFadden's Fourteenth Amendment right to due process and his Eighth Amendment right to a reliable capital sentence, the Court should vacate the conviction or, at the very least, require a new sentencing trial.

## *Guilt-phase argument*

During the guilt phase, Larner committed misconduct by repeatedly assuming the perspective of various players to inject his own speculative views, unsupported by the evidence, of the circumstances of the crime. These flights of fancy inevitably placed McFadden in the worst possible light and sought to trigger the jurors' emotions.

- Larner speculated that McFadden planned to shoot Leslie in the face because that was the worst thing he could do: "He's thinking: I'm going to shoot her in the face. I can really shoot this woman in the face, right in the middle of the face. I can point that gun at her face. I can really ruin this woman's face. You

know? What's the worst place you can think of to shoot a woman? Right in the middle of the face." Tr. 358.

- Larner improperly assumed the victim's thought processes because she was "not here to tell you": "Why does Leslie go to the Skate King? I'll answer all her questions. First of all, Leslie is not here to tell you. Here's what she would say if she was here. . . . I'll speak for Leslie. You know that." Tr. 396.

- Larner speculated that McFadden's attitude toward anyone who knew about the Addison murder was "kill, baby, kill:" "He ain't done killing. He hasn't killed Eva yet, the only eyewitness. Then is he done killing? No. He's got to get the guy that turned him in at the hotel, at the Travel Lodge. . . . 'I'm going to fuck that nigger up.' His words, not mine. Now, what does he mean? What does he mean 'I'm going to fuck that nigger up?' 'You don't cross me, man.' What do you think he meant by that? Kill, baby, kill. That's what he meant." Tr. 334–35.

Besides these transgressions, Larner relied on facts not in evidence when vouching for Eva's reliability: "There are about seven statements that she made. . . . There weren't any inconsistencies in her story, though you don't get to see all the statements for yourself. That's how it works." Tr. 346–47. And he improperly injected his own personal opinion of the defense case for second-degree murder, calling it a "bunch of B.S.": "You heard the defense argument: He didn't do it. But if he did, it's murder

90

second degree. You heard the argument. That's a bunch of B.S. You come back with murder first degree or you don't come back." Tr. 400.

All of these comments were improper. Taken together, they rendered the guilt phase of the trial fundamentally unfair. The Court should grant the writ and order a new trial.

### *Penalty-phase argument*

The improprieties of the guilt-phase close were repeated manifold at the sentencing phase. Larner was practically screaming as he presented an argument rife with his own personal opinions about the proper sentence, misstated facts, and made raw appeals to rage and vengeance. The argument contains about every category of misdeed that courts have condemned in capital cases, including the following:

**Injecting personal opinion by denigrating mitigation.** Larner dismissed the idea that a defendant's history of neglect and difficult upbringing is mitigating, insisting that the jury should only vote for life if the defendant suffered from violent abuse:

> I didn't hear anything mitigating in the case. You know what would have been mitigating? If he had put on family members that said they sexually molested him or that he was abused or beaten. . . . I didn't hear anything like that. All I heard was he came from a good family that tried to do the best they could for him. That's supposed to be mitigation? That's what I heard. It was bizarre. I was waiting for some mitigation. There wasn't any mitigation.

Tr. 771. Likewise, Larner encouraged the jury to discount McFadden's childhood as mitigating: "Look at this guy. It's this guy. This guy that committed the murder, okay?

91

This mean, evil person committed the murder. Not those cute little baby pictures that you're going to see, okay? Remember that. That's just to play on your sympathies." Tr. 781. Later he went even further, claiming that evidence that McFadden bounced from house to house and never had a real home was actually aggravating: "He has a supporting family. No one in his family has been convicted of anything, yet—and everyone tried to help him, yet he still kills. That's aggravating. . . . That's aggravating. They call it mitigating. I call it aggravating." Tr. 794.

**"Send a message."** Courts have routinely condemned prosecutors for telling jurors that they must impose death to send a message to other criminals and to the community at large. Yet Larner told the jury that death was mandatory to signal respect for the criminal-justice system:

> If he would have killed Eva, we wouldn't even be trying this case. . . . What does that tell you about the integrity of the criminal justice system? It demands that you—go out and kill witnesses? It demands that you vote for the death penalty. The integrity of the judge, the criminal justice system. Witnesses need to know they can come forward and be safe. . . . The criminal justice system integrity demands the death penalty in a case like this: a guy that's killing witnesses and wants to kill witnesses.

Tr. 775–76.

**Injecting personal belief that death is warranted.** Prosecutors are to refrain from telling jurors that they personally believe the death penalty is warranted in a given case. Larner didn't honor this prohibition. At first he tried to couch his personal beliefs in the context of the weighing decision:

> [W]e'll all consider both punishments, absolutely. I mean, no doubt. *But we're going to vote for the death penalty because that's the appropriate sentence.* But under the law, the law never says that you have to vote for one and the law never says that you have to vote for the other one, but you got to be fair and impartial. *And you got to do the right thing under the facts and the law.* And you all said that you would do that: in the proper case, you would vote for the death penalty. You all swore to me that you would. And that's why you're sitting here.

Tr. 795. Later the argument was blunter. While disavowing that the jury could show mercy for no reason at all, Larner said death was the only just sentence:

> Now, Ms. Kraft asks for mercy and forgiveness. Well, look around, ladies and gentlemen. We are not in a church. There are no stained glass windows. And I pray that Mr. McFadden can find peace and forgiveness with his creator, but that's not our job. Our job is to give justice. And justice deserves and demands the death penalty.

Tr. 811. By the end, Larner was making a personal appeal to the jurors' integrity, telling them that they "promised" they could vote for death and that there "ain't such a thing" as a death case if not this one:

> And each one of you promised me. Each one of you told me that, in the proper case, you would vote for the death penalty. Well, ladies and gentlemen, this is that case. This defendant, these facts, his criminal background. This is that case. And if this ain't a death penalty case, then there ain't such a thing.

Tr. 818.

**Facts not in evidence.** In an attempt to portray McFadden in the worst possible light, Larner repeatedly made reference to facts that either were not in evidence or that were simply untrue. For example, Larner had a contentious cross-examination with Gwendolyn McFadden about whether the family knew McFadden was wanted

for murder when he went to California. She denied that. Tr. 675–76. Yet Larner insisted that "everyone knew":

> When you consider his family for mitigating, keep this in mind. They knew he was a fugitive from justice out in California. . . . Everyone knew it. . . . You know the police were out looking for him, going to the family's house. That's why they sent him out to California to live with family. He didn't go out there for a family reunion and decide to stay. The guy problem [sic] never left the state in his life until then.

Tr. 779–80. He asked the jury to assume intentionality based on facts about a type of gun not in evidence:

> I don't know if anyone has ever shot a .44 caliber. When you shoot a gun like that, it kicks. It's a big kick. You got to aim it. . . . And then you got to aim again. And it kicks. And you got to aim again. And he put all three of those bullets right on target.

Tr. 786–87. He claimed, contrary to the evidence, that McFadden wanted to kill his son's mother: "And after he shot Eva's sister, he wants to kill Eva. He felt so bad about killing Leslie that he wants to kill Eva." Tr. 789. To undermine the mitigation testimony, he claimed, without support in the record, that McFadden was the aggressor in his teenage altercations:

> Who's the aggressive one in these fights? Who's the aggressive one? He's the one picking fights in the neighborhood. If he was the little guy, he was picking on littler guys. There's always someone littler than you. He's a bully, and he always has been, since he was 16 years old. He came home with a black eye? The other guy had two black eyes."

Tr. 791. Finally, knowing full well that McFadden had already received a long sentence for the Bryant assault and a death sentence for the Franklin murder, he claimed that no one had ever "held him accountable":

94

He's had every break: probation, opportunities for treatment. He's been spitting on the floors of courtrooms for years in all of those cases because no one has held him accountable. And the reason you're going to hold him accountable is because innocent people have a right to live. And murders have no right to not pay for their crimes.

Tr. 817.

**Improper comment on defendant's rights.** In arguing that McFadden "believes in the death penalty," Larner made improper comment on McFadden's exercise of his trial rights:

And on that day that he killed Todd, on the following May, there was one juror in Pine Lawn. That juror was the foreperson. Had no instructions of law. There was no trial. There was no jury instructions. There was no evidence. There were no witnesses. And that foreperson and that juror decided that the death penalty was appropriate then and that Todd and Leslie should not get a fair trial. Because if there's one person in this courtroom that believes in the death penalty, it's that man right there."

Tr. 810. Larner's false equation of McFadden's acts with the denial of trial rights served as an improper comment on McFadden's exercise of those same rights.

**Improper appeal to victim-impact from another case**. Though Todd Franklin was not the victim in this case, Larner ask the jury to execute McFadden on behalf of Franklin's family: "You'll also consider the pain and suffering that McFadden has caused the Franklin family." Tr. 796. His appeal became more vivid (and more inappropriate) later on:

Think of the terror, the horror of Todd's sister, Tara, and mother coming home from the store. . . . Think of it. They come home. They see the body of their son in the driveway and the blood next door to where they live. Think of the terror and the horror of the mother and the sister of Todd

95

Franklin. And think about how they got to live next door after that to be reminded every day by the bloodstain in the driveway next door.

Tr. 819–20.

**Improper appeals to emotion.** At bottom, Larner's argument was an emotional appeal for the jury to give effect to feelings of rage and vengeance. He said McFadden would deserve death if his victim were an animal rather than a person: "A woman begging for her life that has done nothing, that is on the street by herself, dark outside, being shot down like a dog. If it had been a dog, people would be clamoring for the death penalty if you killed an animal like that." Tr. 787. He resorted to epithet and caricature, calling Vincent "evil": "You'll also consider that Leslie was a good person. And you'll consider that he's an evil person." Tr. 797. He went further later on, personalizing the jury's task by equating a death sentence with "love" for the victims: "Ladies and gentlemen, I leave you with Leslie and Todd. Hold them. Hug them. Tell them you love them. But most of all, don't let them down. This verdict is for Leslie and Todd." Tr. 822. He urged the jury to mete out the equivalent of frontier justice:

> Now, look. We live in a civilized society. And back in the olden days, the uncivilized days, we would have allowed the Addison and the Franklin families to go hunt him down like he deserves and get retribution. We wouldn't have had this jury. But that was in the old days. We're more civilized now.

Tr. 814–15. Finally, he equated the jury's fortitude in voting for death with the decision to drop the atomic bomb:

> Ladies and gentlemen, there was a great man from Missouri. A man that, in his private life as you all are, was good and decent. And when he was called on to public service, he had a decision to make, a momentous decision, that actually killed hundreds of thousands of people. And he made that decision. . . . A great Missourian, Harry Truman, said, The buck stops here.

Tr. 821–22.

In sum, Larner's relentless inflammation of the jury, his recklessness with the facts of the case, and his repeated personal appeals converted this most serious of decisions into one based more on emotion than on reasoned judgment. The closing argument rendered the penalty phase fundamentally unfair and the Court should order a new sentencing phase uninfected by improper prosecutorial emotion.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 80–97. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W.3d at 420–26. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 10:   Evidence and argument about the motive for the prior murder violated the Double Jeopardy Clause.**

In McFadden's first trial for the homicide of Todd Franklin, the State asked the jury to find, as an aggravating factor, that "Todd Franklin was a witness in a past prosecution of Lorenzo Smith and Corey Smith for robbery and assault of Todd Franklin and was killed as a result of his status as a witness." Franklin 1 Tr. at 1029. The jury declined to find this aggravating circumstance. Yet the State continued to pursue this issue at the penalty phase of the Addison retrial. Relitigation of an issue that an earlier jury rejected violated McFadden's Fifth Amendment right to be free from Double Jeopardy.

A theme of the State's penalty phase in this case was that McFadden sought to subvert the justice system by eliminating witnesses. To support this theme at the Addison retrial, the State called three witnesses to testify that McFadden killed Todd Franklin in reprisal for his cooperation with authorities in an earlier legal action:

- William Goldstein testified that he represented Lorenzo Smith in a robbery case in which Todd Franklin gave sworn testimony implicating his client and Corey Smith. Lorenzo and Corey Smith pleaded guilty shortly after this testimony. Tr. 490–94.

- Tara Franklin, Todd Franklin's sister, testified that Todd testified against the Smiths and only the Smiths. Tr. 502.

98

- Evelyn Carter testified that the day of Todd's murder McFadden called her in a celebratory mood. "I do remember him saying he was soft and that he snitched. He was going into some details about the whole situation with Todd and Lorenzo. He kept talking about what happened with them and about them being in jail and all that, you know." Asked whether that was "why he did it," Carter responded, "I mean, that's my assumption, yeah, that's why he did it." Tr. 588.

The prosecutor then argued the issue in penalty-phase closing:

> You know, Todd Franklin would not have been killed if he had not been a witness against Corey and Lorenzo. Todd Franklin decided not to take the law in his hands. He decided to go through the criminal justice system and prosecute these two guys who robbed and shot at him. . . . Talk about the integrity of the criminal justice system. There is no integrity in the criminal justice system with a guy like this killing witnesses and killing people that come forward.

Tr. 776.

The Double Jeopardy Clause forbids the relitigation of issues that were resolved in favor of criminal defendants at a prior criminal trial. Here, the State continued to litigate an issue that a previous jury had expressly rejected when it failed to find, as a question of fact, that McFadden killed Franklin in reprisal for his testimony against the Smiths. This evidence was highly prejudicial in the Addison trial for it allowed the prosecutor to paint a portrait of McFadden as someone especially worthy of death because of repeated interference with the criminal-justice system. The Court should

99

vacate McFadden's death sentence and order a resentencing at which McFadden's Double Jeopardy rights are honored.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 98–107. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W. 3d at 426–27. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 11:    Presentation of excessive evidence about the prior murder violated due process.**

Missouri law provides as an aggravating circumstance that "the offense was committed by a person with a prior record of conviction for murder in the first degree." Rev. Stat. Mo. § 565.032.2(1). The State could have proven that circumstance here by simply entering into evidence a copy of McFadden's conviction for the murder of Todd Franklin. Instead, the State used the sentencing phase to retry the Franklin murder in every gory detail—and to provoke the jury's rage in the process. Though the State was within its rights to go beyond the cold record in proving the prior murder, there are limits to what a prosecutor can present rooted in a defendant's due process and Eighth Amendment rights. Here, the prosecutor's presentation of graphic photos and speculative testimony about McFadden's acts crossed the line and

100

violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentence under the Eighth Amendment.

Of the State's thirteen sentencing-phase witnesses, ten testified about the Franklin homicide. (The other three testified either about the Burns/Bryant shooting or McFadden's arrest with crack cocaine.) They described the crime, testified about forensics related to it, introduced graphic photos arising from it, and speculated about McFadden's motives and future conduct.

Gary Lucas testified that he was working on a house when Franklin, McFadden, and a third man came running up. The third man shot Todd in the side and he fell. Then McFadden took the gun. "He kicked him before he shot him and said, 'Nigger ain't dead.' And that's when [McFadden] shot him about three times." Tr. 469. The prosecutor had Lucas repeat this story multiple times for good measure. Tr. 470, 472, 485. The State put on extensive forensic testimony as well. Heather Burke testified that McFadden's fingerprint was found on a cigar at the Franklin scene. William George testified that the bullets recovered from the Franklin scene could have been fired from the same gun. Raj Nanduri testified that Franklin received five gunshot wounds and was alive when he received all five of them.

The State's presentation of numerous bloody crime-scene photos was especially unfair and particularly geared to invoke the jury's wrath. The State introduced seventeen photos related to the Franklin murder through Lucas and Detective Robert Sieck, who investigated the scene. A number of these photos were gruesome

101

depictions of Franklin lying dead in a pool of blood.[3] The cumulative presentation of such images would be prejudicial even if they depicted the victim of the offense for which the defendant was being tried. The prejudice is even stronger when they depict the victim of an unrelated offense.

Not content to rest with verbal and visual depictions of the Franklin murder, the State veered into prejudicial theories about McFadden's motives for the Franklin murder and future dangerousness to anyone who knew about it. As already discussed at Claim 10, through William Goldstein, Tara Franklin, and Evelyn Carter, the State posited—contrary to an earlier jury's finding—that McFadden killed Franklin in reprisal for his testimony against Corey and Lorenzo Smith. There was more in this vein through Jessica Addison, the victim's sister, who claimed that McFadden told her he was going to kill Franklin. Tr. 615. Worse, the State offered rank speculation from Gary Lucas, who moved from St. Louis to Dallas on the advice of others: "[My family] said somebody going to kill me. . . . I went to my boss man house and told my boss man what happened. . . . And they told me—they told me go out of town—go out of town until they catch him." Tr. 475. Testimony that McFadden would kill in a heartbeat pushed the jury irrevocably toward a sentence of death.

---

[3] The relevant photos are State's Exhibits 9, 10, 11, 12, 14, 15, 16, 26, 27, 29, 30, 33, 34, 41, 43, 45, and 46. Counsel has been unable to review all of these photos and has not been able to review color copies of any of them because the St. Louis County Court has declined to provide them without a court order. In discovery McFadden will seek the requisite order so he can more fully illustrate the prejudice arising from introduction of the photos to the jury.

Though some of this evidence in isolation might not have created a constitutional problem, the State piled on too much to withstand scrutiny here. Even discounting the prejudicial testimony about the prior offense, the introduction of the cumulative photos itself justifies relief. By going far beyond what we needed to prove the Franklin murder—by piling bloody photo upon bloody photo, prejudicial description upon prejudicial description—the jury rendered the sentencing phase fundamentally unfair and the emotionally charged death sentence unreliable. The Court should grant the writ and order a new sentencing trial.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 108–115. The claim is reviewed *de novo* because, though the Missouri Supreme Court addressed a related claim arising under state evidentiary law, it did not adjudicate McFadden's federal claim on the merits. *See McFadden II*, 391 S.W.3d at 427. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 12:    The death sentence violates the Eighth Amendment because thirty-seven percent of the jury pool was excluded for inability to vote for death.**

Standards evolve under the Eighth Amendment. "'[E]volving standards of decency mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (citing *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) (plurality)).

103

McFadden's jury-selection process demonstrates the magnitude of that evolution in St. Louis, Missouri. Sixty-one of a potential one-hundred and sixty-four potential jurors, or thirty-seven percent, were struck for their opposition to the death penalty. In spite of this, the trial court overruled McFadden's objection to this dramatic local consensus. Tr. Vol. V at 242.

The exclusion of a significant portion of the venire demonstrates the evolving consensus against the death penalty in St. Louis. To ignore such a consensus against the death penalty constitutes cruel and unusual punishment.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 116–120. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W.3d at 429. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 13:    McFadden wasn't tried by a fair cross-section of the community, in violation of the Sixth Amendment.**

African-American jurors were systematically excluded from the venire from which McFadden's jury was selected. As noted in Issue 3-3, African Americans were underrepresented on McFadden's venire, with an absolute disparity of at least 2.5 percent and a comparative disparity of at least 11.7 percent. Further fact development will show that African-Americans were systematically excluded from St. Louis County

104

jury pools, including McFadden's. McFadden's Sixth Amendment rights were violated as a result.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 120 & n.15. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 391 S.W.3d at 429. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing insofar as the Court determines that the state court's adjudication of this claim was unreasonable under § 2254(d).

**Claim 14:    The prosecutor's bolstering of Eva Addison violated due process.**

Eva Addison was the sole witness who claimed to see McFadden shoot Leslie Addison. Rather than allowing Eva's testimony to speak for itself, the prosecutor repeatedly propped it up by reference to Eva's hearsay statements to the police during their investigation. In doing so the State violated McFadden's right to due process under the Fourteenth Amendment.

On direct examination, after properly having Eva testify from her memory about what happened on the night of the offense, the State, without establishing any lapse in memory, sought to enter a tape of a statement Eva gave to the police as well as a written statement. Tr. at 91–93, 103–04. The court admitted the tape. Then on redirect the State asked Eva about her prior out-of-court utterances more directly, listing various statements that she gave to authorities: an "oral statement to the police

105

the night of the incident," two written statements to the police, a "taped statement to Neske the night of the incident," an "oral statement to Ed McGee, an investigator for the prosecutor's office, in June of '03," a "statement to Ed McGee in December of '03," a "deposition of September the 17th of '04 that the defense took," and prior sworn testimony in previous cases. Tr. 165–66. Then the prosecutor got Eva to say that in none of these statements did she "ever state anything other than you saw that man shoot your sister Leslie." Tr. 167.

The prosecutor further bolstered Eva with these hearsay statements in his arguments to the jury. In opening, he referenced the statements by telling the jury that Eva "told the police immediately" via an "oral statement, taped statement, written statement" that McFadden shot Leslie then "stood over her and shot her again." Tr. 27. In closing he bolstered Eva again, now referencing facts not in evidence: "There are about seven statements that she made. And anything that was inconsistent in those statements could have been brought out. And, if there was a bunch of inconsistencies, they would have been brought out. Do you understand that? There weren't any inconsistencies in her story, from day one, although you don't get to see all the statements for yourself." Tr. 346–47.

The State's repeated bolstering of Eva through hearsay and facts not in evidence rendered the trial fundamentally unfair and had a substantial and injurious effect. Without this bolstering McFadden's guilt would have hinged on the jury's belief that Eva could have identified the killer from a long distance in a poorly lit area. The

106

evidence that Eva had repeatedly identified McFadden gave her testimony an authority it otherwise lacked. This evidence should not have been admitted and McFadden is entitled to a new trial as a result.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 124–30. The claim is reviewed *de novo* because, though the Missouri Supreme Court addressed a related claim arising under state evidentiary law, it did not adjudicate McFadden's federal claim on the merits. *See McFadden II*, 391 S.W.3d at 429–30. That merits determination is contrary to and/or an unreasonable application of the law. McFadden does not seek an evidentiary hearing on this claim.

**Claim 15:    The prosecutor's leading of Eva Addison violated due process.**

At trial, the prosecutor, Keith Larner, repeatedly testified during his questioning of Eva Addison by asking her leading questions about the crime. The leading was so pervasive as to violate McFadden's due-process rights under the Fourteenth Amendment.

As noted, Eva was the only eyewitness to identify McFadden as the killer. In doing so, she received assistance from Larner, whose leading questions put words in her mouth. The questions include the following:

- Larner led Eva into explaining the events before the shooting: "Did he say that you—and did he tell you and your sisters to get out of Pine Lawn? . . . Did you

107

already say that he told you and your sisters to—ho's to get out of Pine Lawn?" Tr. 64.

- Larner led Eva into the facts of the shooting: "Did you hear her say, 'Please don't shoot me?' . . . And did you see him point the gun at her?" Tr. 73. Larner also posited the idea that McFadden laughed as he shot Leslie: "Now when he—now when he first—when he was at the place where he shot her, and he squeezed the trigger, did you tell the police that night that it didn't go off and he started laughing? . . . Did he give any type of gesture or laugh or any saying like that?" Tr. 75, 77. Eva never independently testified that McFadden laughed, and it was particularly prejudicial for the prosecutor to lead her into the idea that McFadden took pleasure in the killing. Unsurprisingly, Larner argued to the jury in closing that McFadden "likes to kill. Enjoys it." Tr. 788.

- Larner also led Eva into statements about events after the offense relevant to McFadden's guilt: "Did he tell you to go into court and say it wasn't him?" Tr. 127? Of Eva's decision to stay with McFadden's relative after the incident: "And is that where you were staying also because you felt safer there . . . after he killed your sister?" Tr. 138.

These incessant leading questions rendered the trial fundamentally unfair by presenting the jury with Larner's biased view of the case rather than with Eva's straightforward testimony. Had Larner not testified, Eva's credibility would have been

more squarely in issue and the case against McFadden would have been much weaker. The Court should order a new trial due to this substantial and injurious effect.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 136–40. The claim is reviewed *de novo* because, though the Missouri Supreme Court addressed a related claim arising under state evidentiary law, it did not adjudicate McFadden's federal claim on the merits. *See McFadden II*, 391 S.W.3d at 431. McFadden does not seek an evidentiary hearing on this claim.

**Claim 16:    Denial of access to the sole eyewitness's school and medical records violated McFadden's right to present a complete defense and the Confrontation Clause.**

Before trial, counsel requested disclosure of Eva Addison's school and medical records to discover any mental, emotional, or physical disability that might affect her ability to observe and accurately recount what she saw and heard on the night of Leslie's killing. Counsel argued that the records were needed because Eva had had trouble reading a clock in a *previous* trial—a prescient objection given Eva's similar difficulties at the trial in this case. *See* Pretrial Hr'g at 42–50. The court declined to grant access to the records or to at least inspect them *in camera*, accepting the prosecutor's protest that he, personally, did not have them. By denying counsel access to relevant records from the most important eyewitness to the crime, the trial court denied McFadden his right to confront witnesses under the Sixth Amendment and his

109

right to present a complete defense as guaranteed by the Due Process Clause of the Fourteenth Amendment.

Disclosure of the records may have allowed McFadden to enhance his cross-examination and his defense in multiple ways. Most notably, it may have rebutted the notion that Eva had perfect eyesight and thus could be 100 percent certain about her identification of McFadden (even in the dark). The records may also have contained information about Eva's mental or emotional instability that would have rendered effective (even outcome dispositive) impeachment. McFadden will request the records in discovery to more fully show how the trial court's denial affected McFadden's ability to perform an effective cross-examination and to put on a complete defense.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 141–51. The claim is reviewed *de novo* because, though the Missouri Supreme Court addressed a related claim arising under state evidentiary law, it did not adjudicate McFadden's federal claim on the merits. *See McFadden II*, 391 S.W.3d at 432. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing on this claim. Section 2254(e) doesn't bar such a hearing because McFadden was diligent in seeking to develop the factual basis of the claim in state court.

110

**Claim 17:     The prosecutor withheld evidence in violation of *Brady v.
Maryland*.**

Throughout the history of McFadden's case, the prosecution has engaged in serious misconduct. The Missouri Supreme Court overturned a previous death sentence, reversed, and remanded for a new trial the first trial in this matter on the basis of the prosecutor's racist conduct in jury selection. *See McFadden I*. It also overturned McFadden's conviction and sentence in the Franklin matter on the same grounds. *See State v. McFadden*, 191 S.W.3d 648 (Mo. 2006). Acting with racial and discriminatory animus to skew a result constitutes egregious misconduct—but it also evidences the contours of the State's desire to win at all costs.

In post-conviction, a member of that same prosecutor's office improperly conferred with the judge *ex parte* regarding McFadden's matter, leading the judge to withdraw. The prosecutor noted that while he did not have a specific recollection, "I probably discussed the facts of those cases." Larner Depo at 8; *see also id.* ("[I]t is very well possible that I did."); *id.* at 9 ("I am pretty sure I talked to him about the facts."). The prosecutor noted that even in social settings he "would have had no hesitancy to talk to Judge Goldman about the facts of the case." *Id.* Larner estimated that "I very well could have talked to Judge about some of the experiences I had in the trial." *Id.* "He is someone I would have to say I probably very well talked about the facts of the case, back in '07 and '08. And then after the trial, what some of the highlights were." *Id.* at 20; *see also* Goldman Depo at 7 ("I thought that Mr. Larner has talked to me

111

about some of the cases that he tried in different divisions, occasionally. The more serious ones. Like this one would have been one of those types.").

The case against McFadden hinged upon two witnesses—only one of whom, Eva Addison, professed to identify McFadden. There was no other physical or scientific evidence. It became a contest of credibility; hence, any matter that could impeach those witnesses was heightened. For instance, the State opposed and prevented from disclosure Eva's medical and school records. If the State possesses or constructively possesses those materials, Eva's records should have been turned over to McFadden as valid impeachment evidence.

Had evidence favorable to McFadden existed and the State failed to turn it over to defense counsel, it would have been in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). If impeachment evidence or affirmative evidence that McFadden did not commit the offense existed, there is a reasonable probability that the result of the proceeding would have been different.

Further, the State was under an obligation to turn over exculpatory evidence related to sentencing. If the State suppressed evidence material to the penalty phase, there is a reasonable probability that the result of the sentencing proceeding would have been different.

*****

This claim is procedurally defaulted by virtue of the State's failure to turn over constitutionally required materials. McFadden requests an evidentiary hearing to

112

determine whether he can establish cause and prejudice to forgive the default. *See Strickler v. Greene*, 527 U.S. 263 (1999). Section 2254(e)(2) permits a hearing. *See Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000).

**Claim 18:    Striking of jurors for their religious beliefs violated equal protection.**

The Supreme Court has repeatedly held that governmental discrimination against religion violates the Constitution. A State may not engage in actions that discriminate against people who are religious, against particular religious organizations, or against the exercise of religious speech. In short, the government may not discriminate against religion generally or against particular religious denominations or belief systems. See *Morris Cnty. Bd. of Chosen Freeholders v. Freedom from Religion Foundation*, 139 S. Ct. 909, 909–10 (2019) (statement of Kavanaugh, J., respecting denial of certiorari); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2023–24 (2017); *Larson v. Valente*, 456 U. S. 228, 244 (1982).

In the case herein, 61 potential jurors were struck for their death views. Of those 61, the court struck 20 people—12.5 percent of the 159 jurors questioned—for death-penalty views that were explicitly grounded in religion. Specifically, venire members Boyd, Heet, Davis, Bunch, Rebholz, Hornak, Linville, Merz, Gray, Williamson, Ousley, Ayidiya, Hernton, Horst, Robinson, Rohrbacker, Burgarin, Tornetto, Bonastia, and Schlake expressed religious opposition to the death penalty that precluded their imposing it. Vol. I Tr. p. 52, 187–98, 287–88, 327, 400–02; Vol. II Tr.

113

p. 30–33, 40–42, 43–44, 54–56, 107–11, 114–17, 134–38; Vol. III Tr. 141–43, 208–19, 221–23, 363, 416–17, 440–43; Vol. IV Tr. 245–50. The prosecution struck them for cause, without objection.  The Constitution prohibits such religious discrimination even if the venire members belong to different denominations.

The First Amendment's Free Exercise Clause, applicable to the States through the Fourteenth Amendment—a right deeply rooted in tradition, *Washington v. Glucksberg*, 521 U.S. 702, 720–21(1997)—prohibits state action establishing or preventing the free exercise of religion. *Cantwell v. Connecticut*, 310 U.S. 296 (1940). By granting those motions for cause, the trial court denied the venire members' federal constitutional rights to participate in the judicial process and freedom from religious discrimination, and violated McFadden's federal constitutional rights to jurors chosen without regard to religious beliefs, equal protection, due process, a fair trial, and freedom from cruel and unusual punishment.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 157–60. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *See McFadden II*, 391 S.W.3d at 433. That merits determination is contrary to and/or an unreasonable application of the law. McFadden seeks an evidentiary hearing on this claim. Section 2254(e) doesn't bar such a hearing because McFadden was diligent in seeking to develop the factual basis of the claim in state court.

114

## PRAYER FOR RELIEF

WHEREFORE, McFadden prays for the following relief:

1.    Issue a show-cause order;

2.    That discovery be granted as is necessary for a full and fair resolution of the claims contained in this petition;

3.    That leave to amend this petition be granted as appropriate;

4.    That an evidentiary hearing be conducted on all disputed issues of fact;

5.    That he be granted a new state direct appeal and new state post-conviction proceeding;

6.    That his convictions be vacated;

7.    That his sentences be vacated; and

8.    That all other appropriate relief be granted.

Dated:  August 19, 2019                     Respectfully submitted,

/s/ Laurence E. Komp                     /s/ Scott W. Braden
Laurence E. Komp, MO Bar 40446           Scott W. Braden, AR Bar 2007123
Capital Habeas Unit, Chief               John C. Williams, AR Bar 2013233
Federal Public Defender                  Assistant Federal Public Defenders
Western District of Missouri             Federal Public Defender's Office
1000 Walnut, Ste. 600                    Eastern District of Arkansas
Kansas City, MO 64106                    1401 West Capitol, Suite 490
816-471-8282                             Little Rock, AR 72201
laurence_komp@fd.org                     501-324-6114
                                         scott_braden@fd.org
                                         john_c_williams@fd.org


*Counsel for Vincent McFadden*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2018, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by cooperation of the CM/ECF system.

*/s/ Laurence E. Komp*
Laurence E. Komp
Counsel for Petitioner